667 A.2d 695

LEONARD F. HILL, KENNETH F. KUNZMAN AND WILLIAM L. STRONG, SUCCESSOR TRUSTEES UNDER AGREEMENT DATED OCTOBER 30, 1944, PLAINTIFFS–APPELLANTS, v. ESTATE OF MARY LEA JOHNSON RICHARDS, DEFENDANT, AND MARTIN RICHARDS, DEFENDANT–RESPONDENT, AND ERIC BRUCE RYAN, SEWARD JOHNSON RYAN, RODERICK NEWBOLD RYAN, HILLARY ARMSTRONG RYAN, ALICE RUTH RYAN MARRIOTT, QUENTIN REGIS RYAN, JESSICA RYAN, HEATHYR NELSON RYAN, EMILY MASON RYAN,

MARY LEA MARTHA RYAN, SCOTLAN TAYLOR RYAN, HAR-
RISON HUNTER RYAN, CHRISTOPHER RODERICK RYAN,
JOHNATHAN DILL RYAN, MATTHEW RYAN MARRIOTT, STE-
PHANIE RUTH MARRIOTT, ALLISON KENDALL MARRIOTT,
IAN QUENTIN RYAN, ZACHARY WILLIAM RYAN AND WIL-
LIAM A.K. RYAN, DEFENDANTS–APPELLANTS.

Argued September 26, 1995—Decided December 14, 1995.

*Harry Heher, Jr.,* and *Joseph C. Mahon,* argued the cause for appellant Eric B. Ryan (*Heher, Clarke & St. Landau* and *Hill Wallack,* attorneys for Eric B. Ryan; and *Simon & Lupo,* attorneys for Seward Johnson Ryan, Hillary Armstrong Ryan, and Quentin Regis Ryan).

*Andrea J. Sullivan,* argued the cause for appellants Jessica Ryan, Emily Mason Ryan, Mary Lea Martha Ryan, Scotlan Taylor Ryan, Harrison Hunter Ryan, Christopher Roderick Ryan, Jonathan Dill Ryan, Matthew Ryan Marriott, Stephanie Ruth Marriott, Allison Kendall Marriott, Ian Quentin Ryan, and Zachary William Ryan (*Greenbaum, Rowe, Smith, Ravin & Davis,* attorneys).

*James C. Pitney,* argued the cause for appellants Leonard F. Hill, Kenneth F. Kunzman and William L. Strong, etc. (*Pitney, Hardin, Kipp & Szuch,* attorneys).

*Kathleen McLeod Caminiti,* argued the cause for appellants Alice Ruth Ryan Marriott, Roderick Newbold Ryan, and William A.K. Ryan (*Collier, Jacob & Mills,* attorneys).

*Neal Solomon,* argued the cause for respondent (*Pellettieri Rabstein and Altman,* attorneys).

The opinion of the Court was delivered by

O'HERN, J.

This appeal concerns the proper allocation of federal income tax liability between the income and principal shares of a trust. Federal income tax law may disregard the law of trust and estates in determining whether a distribution to beneficiaries is of income or principal. In order to avoid the tracing of income, the Internal Revenue Code provides generally that, to the extent that a trust

or estate has accumulated income during a tax year, any distributions from the trust during that tax year shall be treated as taxable income for federal income tax purposes.

In this case, a beneficiary who received an interim or advance distribution of trust property, because the interim distributions were not made in equal proportions to final distributions, has borne a disproportionate share of the income tax on the income accumulated by the trust during the 1990 tax year. In essence, the beneficiary seeks the reallocation of that tax burden among other beneficiaries in accordance with their respective shares.

Because the beneficiary who received the disproportionate advance distribution drew up the agreement for the interim distribution, he was in the best position to foresee and foreclose the possibility of disproportionate tax treatment of the distributions. We believe that it is unfair now to make a retroactive adjustment of the shares of other beneficiaries, some of whom received no interim distributions and many of whom may have placed their affairs in order in reliance on the court-approved final distribution of the trust assets.

I

For purposes of this appeal, we accept generally the version of the case and the format of discussion set forth in the papers of Martin Richards, who bears the disproportionate income tax burden. Martin Richards is the surviving spouse of Mary Lea Johnson Richards (Mary Lea). Mary Lea was one of the several children of J. Seward Johnson, the son of the founder of the Johnson & Johnson corporation (J & J).

### The 1944 Trust

In 1944, J. Seward Johnson created a lifetime trust of 15,000 shares of J & J stock. Over the forty-six years until Mary Lea's death, the value of that trust increased to over $70 million. Under the terms of the 1944 Trust, Mary Lea was entitled to receive the income and such amount of the principal as was necessary for her

support and maintenance and was given the authority by exercise of power of appointment in her will to direct the distribution of the trust principal. Even before her death, Mary Lea was engaged in litigation with her children concerning the effect of a separation agreement that she had made with her prior husband, who was their father.

### The Post–Death Agreement

Mary Lea died, a resident of Suffolk County, New York, on May 3, 1990. She was survived by Martin Richards (her husband) and six adult children from the prior marriage: Eric Bruce Ryan, Seward Johnson Ryan, Roderick Newbold Ryan, Hillary Armstrong Ryan, Alice Ryan Marriott and Quentin Regis Ryan (the "six children"). She was also survived by one adult grandchild, Heathyr Nelson Ryan, and numerous minor grandchildren.

By her will dated April 17, 1990, Mary Lea exercised her special power of appointment over the 1944 Trust to resolve their respective claims to the trust property. Mr. Richards and the six children entered a Stipulation and Compromise Agreement dated June 12, 1990 (the "Agreement") that set forth the manner in which the principal and income of the 1944 Trust were to be distributed.

Only a few of the provisions of the Agreement are relevant here. In paragraph 5 of the Agreement, all of the signers agreed that $6.5 million in cash would be distributed to Mr. Richards from the principal of the trust. In paragraph 8, they agreed that $100,000 in cash and 800 shares of stock in Johnson & Johnson Corp. would be distributed from trust principal to each of the six children. Certain other paragraphs of the Agreement provided for the distribution of various specific dollar amounts, while paragraphs 6, 10 and 12 through 15 provided for the division into fractional shares of the balance of the trust principal remaining after the distribution of the fixed items was made. Under these provisions, Mr. Richards was to receive approximately 47 per cent of this

balance, while the six children and Mrs. Richard's grandchildren were to receive among them about 53 per cent.

Paragraph 16 of the Agreement specifically set forth the manner in which the income of the 1944 Trust that accumulated after Mrs. Richard's death would be allocated. Essentially, paragraph 16 provided that this income would be divided among the beneficiaries in the same proportions as were established for the shares of the trust principal under the fractional share provisions. Accordingly, Mr. Richards was to receive approximately 47 per cent of the 1944 Trust's income, while the remaining 53 per cent of that income was allocated among the other beneficiaries. With respect to whether the specific dollar amounts, including the $6.5 million that was to go to Mr. Richards and the $100,000 in cash that was to go to each of the six children, were intended to be paid out of the trust's income, paragraph 16 provided:

> No recipient of a cash distribution under paragraphs 3, 4, [$6.5 million to Mr. Richards], 7, 8 [$100,000 and 800 shares of stock to each of six children] or 9 hereof shall be entitled to any income of the 1944 Trust with respect to such cash distribution.[1]

### The 1990 Distribution

While awaiting approval of the Agreement by the Suffolk County Surrogate's Court, Mr. Richards and the six children requested the Trustees to make advance distributions in partial satisfaction of the payments to which they were entitled under the Agreement. In response to these requests, in September 1990, the Trustees distributed $6.5 million in cash principal to Mr. Richards and $100,000 in cash principal and 800 shares of Johnson & Johnson stock to each of the six children.

---

[1] Paragraph 26 of the Agreement provided that each of the parties agreed that the Agreement was governed, construed and interpreted in accordance with the laws of the State of New York, but the issues before us have been briefed on New Jersey law. At oral argument, all counsel agreed that the Agreement should be construed under New Jersey law.

*The Amendment*

In early February 1991, Mr. Richards, the six children and Mrs. Richards' only adult grandchild, defendant Heathyr Nelson Ryan, executed an Amendment to the Agreement (the "Amendment"), which added the following language to paragraph 23 of the original Agreement: "The parties agree to take positions for tax purposes consistent with the terms of this Agreement, and to cooperate with each other in maintaining those positions." The Amendment, drafted by Mr. Richards' New York counsel, was filed in the Suffolk County Surrogate's Court on February 27, 1991.

At almost the same time that it circulated the amendment draft, Richards' counsel wrote a letter, on February 15, 1991, to the Trustees' counsel setting forth Richards' opinion, based in part on the explicit provisions of the Agreement as well as on two IRS private letter rulings, that the principal distributions made in 1990 to Mr. Richards and to the six children did not carry out income to the beneficiaries for income tax purposes. Accordingly, Richards urged that income taxes due on the trust's 1990 income accumulated after Mrs. Richards' death be payable out of the trust. Copies of this letter were sent to counsel for all six children about ten days prior to the filing of the Amendment in the Suffolk County Surrogate's Court but after the Amendment had been executed.

*The IRS Private Letter Ruling*

In May 1991, the Trustees sought a private letter ruling from the Internal Revenue Service on whether the September 1990 distributions were deemed to carry out income for income tax purposes to the beneficiaries. In their request the Trustees adopted the analysis set forth in the February 15th letter of Richards' counsel and expressed their belief that the 1990 distributions did not carry out income to the beneficiaries for income tax purposes.

In September 1991, the Suffolk County, New York Surrogate's Court approved the Agreement and Amendment and admitted the will to probate subject to those documents. Later in the fall of

1991, partly in reliance upon oral assurances from local IRS officials that a favorable ruling would be forthcoming, the Trustees filed 1990 fiduciary income tax returns that reflected the position advocated in the ruling request (i.e., that the 1990 distributions carried out no income) and paid the resulting state and federal income taxes out of the trust.

By letter ruling dated January 31, 1992, the IRS unexpectedly rejected the position of the Trustees and its own earlier letter rulings and instead held that the 1990 distributions in fact carried out income to the beneficiaries for income tax purposes. The IRS ruling went on explicitly to provide: "Except as specifically set forth above, we express no opinion concerning the federal tax consequences of the above-described facts."

Thus, the IRS ruling made no determination on questions relating to how the income distributed in 1990, or the tax liabilities associated with that income, should be allocated among the beneficiaries. Trustees' counsel specifically sought guidance from the IRS with respect to these questions. The IRS declined to address them, however, indicating only that it wished to reverse the result of its earlier private letter rulings that supported the position that the 1990 distributions carried out no income for tax purposes.

### The Amended Returns

Following receipt of the IRS letter ruling, the Trustees filed amended fiduciary income tax returns for 1990. Those returns reflected the trust's 1990 income of approximately $1.7 million as having been distributed to the beneficiaries as part of the 1990 distributions, meaning that the taxes due on this income would now be payable by the beneficiaries, not the trust. The Trustees made application by these returns for refunds, from the United States of $491,558.45 and from the State of New Jersey of $61,082.52, to recover the 1990 income taxes that the Trustees had previously paid.

These amended returns further showed the trust's 1990 income as having been distributed to the beneficiaries in proportion to the

respective size of the principal distribution each beneficiary received in 1990, not in proportion to each beneficiary's interest in the trust, and, perhaps more important, not in proportion to the amount of 1990 trust income that each beneficiary actually received in accordance with paragraph 16 of the Agreement.

The result was that Martin Richards, who was entitled under the Agreement to only 47 per cent, or about $800,000 of the trust's 1990 income, was treated for tax purposes on the amended returns as having received over 91 per cent, or over $1.5 million, of that income (this because he did receive 91 per cent of the cash distributed in 1990). The other beneficiaries, who among them were entitled under the Agreement to 53 per cent, or over $900,000 of the 1990 income, were treated on those returns as having received less than 9 per cent, or less than $150,000. Mr. Richards claims to have been required to pay taxes and interest of over $291,000 on some $770,000 of 1990 trust income that was actually received by the other trust beneficiaries. (Under principles of accounting, the analysis presumably would be like that which differentiates between doing business on a cash basis or an accrual basis. The IRS taxed the distributions on the cash basis of their proportions.)

### The Equitable Adjustment Motion

On April 2, 1992, Mr. Richards sought from the Chancery Division reimbursement to him out of the other beneficiaries' respective shares of the 1944 Trust of an amount equal to the income taxes he was required to pay on trust income that those beneficiaries received. In response, most of the beneficiaries maintained that Mr. Richards was, in fact, seeking to have the court reverse the IRS private letter ruling. Mr. Richards countered that while he had accepted the letter ruling's conclusion that the distributions carried out income for tax purposes as correct for purposes of his motion, he sought only an adjustment among the beneficiaries' respective interests in the trust and did not attempt to fix any party's actual tax liability. On May 14, 1992, the

Chancery Division denied the motion for equitable adjustment on the grounds that Richards' liability was consistent with the terms of the post-death agreement between Richards and the six children as drafted by Richards' own counsel.

### The Tax Refund Motion

Following the Chancery Division's denial of Richards' equitable adjustment motion, the Trustees received from the United States and the State of New Jersey the approximate $550,000 in income tax refunds. The Trustees sought authorization to distribute these refunds to the beneficiaries in the proportions provided in paragraph 16 of the Agreement for the distribution of trust income (47 per cent to Martin Richards, 53 per cent to the other beneficiaries). Richards made a cross-motion for distribution of the refunds in a manner consistent with that which the Trustees had used in the amended 1990 fiduciary income tax returns, and which had in effect been upheld by the Chancery Division: 91 per cent to him, 9 per cent to the other beneficiaries.

The Chancery Division granted the Trustees' motion and denied Richards' cross-motion. Richards appealed to the Appellate Division, arguing that the results reached by the Chancery Court at these two hearings were inconsistent with each other and that the court had caused a double injury to Mr. Richards.

The Appellate Division first determined that the trial court properly denied Richards' motion to compel the beneficiaries to reimburse him for the taxes he paid on the partial distribution. The court concurred with the lower court's conclusion that Richards' tax liability was consistent with the terms of the 1990 Agreement between the parties. Further, the court noted that any ambiguities in that Agreement regarding the manner in which income taxes on partial distributions would be paid were properly construed against Richards by the trial court because Richards' own counsel had drafted the Agreement.

Moreover, the Appellate Division noted that no equitable principle warranted the court's "interference with the Trustees' exercise of discretion which Richards does not claim has been abused."

On Richards' second contention, however—that the trial court should have ordered the tax refunds to be allocated according to the amount of taxes paid rather than in accordance with the 1990 agreement—the Appellate Division parted company with the Chancery Division. Recognizing that the refunds were trust assets and giving deference to the scope of trustees' discretion to allocate trust assets, the Appellate Division nevertheless found, based upon equitable considerations, "that the refund should have been allocated by the Trustees proportionate to the way in which the taxes were paid." Accordingly, the Appellate Division reversed on this second ground and remanded the case for the trial court to enter an order directing the Trustees to redistribute the refunds in proportion to the taxes paid on the partial distribution. We granted certification. 142 *N.J.* 447, 663 *A.*2d 1354 (1995).

## II

We agree generally as well with the analysis of the background legal issues as set forth in Richards' brief. Prior to 1954, income tax law followed trust law. Unless trustees designated a distribution as from the current income of a trust, the distribution was not taxable to the recipient beneficiary as income. To diminish the opportunities for trustees to manipulate accountings in order to defer the payment of income taxes or shift the payment of taxes to lower bracket taxpayers, Congress enacted section 662(a) of the Internal Revenue Code of 1954. That section provides generally that, to the extent a trust or estate has accumulated income during a tax year, any distributions from the trust during that tax year shall be treated as taxable income for federal income tax purposes.

Congress intended thereby to eliminate the need for "tracing of income" by the IRS. The following quotation from *Harkness v. United States*, 199 *Ct.Cl.* 721, 469 *F.*2d 310 (1972), *cert. denied*, 414

*U.S.* 820, 94 *S.Ct.* 115, 38 *L.Ed.*2d 53 (1973), explains the reasoning:

Section 662(a)(2)(B) was specifically intended ... "to avoid the necessity for tracing of income." Such tracing was required by the 1939 Code, which provided that distributions by an estate or trust to its beneficiaries were taxed to the beneficiaries for the taxable year in which they received the distributions only if the distributions were made from the current income of the estate or trust. As shown, this lent itself to various kinds of manipulations by executors in the labeling of estate moneys as "income" or "principal." To eliminate such manipulations and tax consequences based upon such estate tax accounting designations of what was "principal" and "income" and from which source a distribution had been made, the "tracing" requirement was, for such distribution purposes, eliminated. Instead, "[t]he beneficiary's proportionate share of the distributable net income * * * is determined by taking the same fractional part of [the] distributable net income * * * as the * * * amounts * * * distributed to him * * * bear to the total of [the] amounts * * * distributed to all beneficiaries." In short, Congress wished to establish an easily useable formula, and to avoid both the necessity of "tracing" and an inquiry into the subjective intention of executors or trustees.

The disparity between trust and estate accounting principles and the principles of accounting for purposes of federal taxation can result in inequities to beneficiaries of trusts and estates. This has been recognized in many jurisdictions, including New Jersey. *N.J.S.A.* 3B:19A–32 specifically authorizes adjustments to remedy inequitable results:

Notwithstanding the foregoing provisions of this chapter, if the fiduciary determines that either the income beneficiaries or the remaindermen would benefit unreasonably or inequitably at the expense of the other from the strict application of any provision of this chapter, the fiduciary shall allocate the item between income and principal, in whole or in part, in such manner and in such proportions as the fiduciary determines to be reasonable and equitable in order to preserve the respective interests of the beneficiaries.

[*N.J.S.A.* 3B:19A–32.]

■ In this case, because Martin Richards received, in 1990, a distribution of principal from the 1944 Trust that the IRS deemed to be taxable as income to him, he suffered 91.4 per cent of the income tax imposed on the trust's 1990 distributions, when in reality (after the necessary later trust accounting adjustments) he received only about 46.7 per cent of that income. As a result, the other beneficiaries may have received a windfall. Although they eventually received (under principles of trust accounting) over 53 per cent of the trust's 1990 income, they paid income tax on less

than 9 per cent of that income. The Appellate Division regarded this as an unfair result. It reversed the trial court's judgment in order to obtain a result that it viewed as fair and equitable to all of the interested parties.

We have no difficulty with the Appellate Division's recognition of the doctrine of equitable adjustment to remedy unjust results. We are not satisfied, however, that in the circumstances of this case the results are so inequitable as to call for an invocation of that doctrine.

Respondent's reliance on the case of *In re Estate of Warms*, 140 *N.Y.S.*2d 169 (Surr.Ct.1955), is unpersuasive. In *Warms* the executor elected to use the estate administration expenses, which are, for estate accounting purposes, chargeable to principal, as income tax deductions instead of estate tax deductions. Two direct consequences to the estate beneficiaries resulted from this decision. First, the estate's taxable income was reduced, thereby reducing the income taxes, and second, the estate taxes, which were chargeable as corpus, were increased. The Surrogate's Court held that it was inappropriate for the income account to receive the tax benefit of expenses paid by principal when the effect was to increase the tax burden on the corpus. The court thereafter ordered the income account to reimburse the principal account for the amount of the increase in estate tax that resulted from using estate administration expenses as income tax deductions rather than estate tax deductions.

The difference that we see in this case is that it was not the Trustees who made a conscious decision to allocate the income taxes to Martin Richards. In fact, as noted from the procedural history, the Trustees, to the extent possible, attempted to cooperate with Richards and his assessment of the tax liabilities. The problem is that the Internal Revenue Service did not agree. The record does not disclose in detail the divergent tax consequences. Nor does the record fully disclose the effect of the tax shifting in the sense that Martin Richards did not contest the assessment of taxes against him with the Internal Revenue Service. Generally it

is said that the *Warms* adjustment has been invoked when one beneficiary finally benefited at the expense of another beneficiary due to the discretion or impartiality of Trustees or Executors. *In re Jacobs,* 161 *Misc.*2d 741, 614 *N.Y.S.*2d 866, 867 (Surr.Ct.1994).

In *Cooper v. Parkinson,* 186 *So.*2d 844 (Fla.Dist.Ct.App.1966), a widow receiving an early distribution of dower claimed that she had been unfairly required to pay personal income taxes on more than her one-third share of the estate. The court ordered a remand to consider "other facts determinative of the amount of excess tax, if any, that the widow will pay." However, there was in that case an agreement under which the "[w]idow preserve[d] her right to claim compensation from the Executor because of the fact that she will be required to pay Federal income taxes on moneys already distributed to her by the Executor."

In *In Re Holloway's Estate,* 68 *Misc.*2d 361, 327 *N.Y.S.*2d 865 (Surr.Ct.1972), the court did hold that when non-elective tax procedures result in an alteration of a beneficiary's interest, a court may override statutory principal and income allocation rules and order an adjustment. *Holloway* is distinguished from this case, however, because the beneficiaries in *Holloway* did not create the inequitable circumstances as did Richards in the case at bar. The inequitable circumstances in *Holloway* were the result of the applicable tax statute that deemed "all distributions, whether of corpus or income, as taxable income to the recipients." *Holloway, supra,* 327 *N.Y.S.*2d at 865–66. The inequitable circumstances in this case were, in part, the result of Richards' successful petition to the Trustees to make a distribution they otherwise might not have made.

■ We are satisfied in the circumstances of this case that the Trustees did not breach any duty of impartiality in making the advance distributions. The Trustees were quite willing to treat the 1990 advance distributions as principal distributions. In good faith, the Trustees paid the taxes on the 1990 income as though it had been accumulated. It was the IRS that viewed the income as having been distributed. Richards, under the advice of counsel,

petitioned the Trustees to make a distribution that they otherwise would not have made. Had Richards waited for the entire trust to be distributed, it is unlikely that the tax apportionment would have been the same. (A final distribution would have been in the 47 per cent to 53 per cent proportions.) *Holloway* does not stand as authority for an adjustment of inequities created in part by the party seeking the adjustment.

On balance, we believe that the Chancery Court correctly assessed the equities in the situation. It is true that the parties may not have fully foreseen the tax consequences of the advance distribution, but it was equally clear that the interim or advance distribution was not at all proportionate to. the final distributions. It is also equally clear that on or about February 15, 1991, when the parties made the final Amendment to the Agreement, Richards could, like the widow in *Cooper*, have added a line to the agreement that, to the extent there should be any disproportionate income tax treatment of the distribution, adjustments would be made in the accounts of the beneficiaries. By 1991 there was a substantial body of case law and commentary regarding the threat of possible disproportionate income tax treatment of distributions of trust and estate property. *See* Joel C. Dobris, *Equitable Adjustments in Postmortem Income Tax Planning: An Unremitting Diet of Warms*, 65 *Iowa L.Rev.* 103 (1979); *see also Holloway, supra*, 327 *N.Y.S.*2d at 866 (explaining that the 1954 Code policy could be either a "tax trap" or a valuable post-mortem tax planning tool depending upon how it is used). In light of that threat, rather than counting on equity to remedy such treatment after the fact, prudence would have dictated affirmative measures to avoid such disparate treatment when the 1990 distribution was arranged or, surely, when the parties negotiated the 1991 Amendment to the Agreement.

It comes now too late to make a retroactive adjustment of accounts. As we understand the record, the Trustees have, pursuant to court approval, made final distribution of the trust assets and would have to recover the funds from other beneficia-

ries. A full assessment of the equities of any such recovery would require consideration of the extent to which final distributees, such as grandchildren, may by necessity have been required to consume the principal amounts distributed to them, and whether there would be any unfairness in requiring them to return distributed trust property to Mr. Richards. In addition, we were informed at oral argument that the record does not disclose the actual amount of income tax paid by Richards on the distribution. Finally, the simple fact remains that Richards did receive a disproportionate share of the 1990 advance distribution and may have benefitted to the extent that he had an earlier use of his inheritance than others. All of these factors would have to have been assessed before a court could make an equitable adjustment of interests under a trust. The record before us provides an insufficient basis for an equitable adjustment.

The judgment of the Appellate Division is reversed. The judgment of the Chancery Division is reinstated.

*For reversal and reinstatement*—Chief Justice WILENTZ and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI, STEIN and COLEMAN—7.

*Opposed*—None.