765 A.2d 746

IN THE MATTER OF THE TRUST CREATED BY AGREEMENT DATED DECEMBER 20, 1961 BY AND BETWEEN JOHN SE-WARD JOHNSON, GRANTOR, AND PHILIP B. HOFMANN, GUSTAV O. LIENHARD, AND KENNETH PERRY, TRUSTEES, (KNOWN AS THE JOHN SEWARD JOHNSON 1961 CHARITA-BLE TRUST)

Argued October 10, 2000—Decided February 15, 2001.

342

*Thomas J. Bitar* argued the cause for appellant, *pro se* as Guardian *Ad Litem* for Henry Bruce Sheeran (*Dillon, Bitar & Luther*, attorneys; *Mr. Bitar* and *Mary A. Powers*, on the briefs).

*Robert J. Del Tufo* argued the cause for appellant Jenny Anne Josephine Johnson (*Skadden, Arps, Slate, Meagher & Flom*, attorneys).

*Richard M. Altman* argued the cause for respondents John Seward Johnson, III and Clelia C. Johnson (*Pellettieri, Rabstein & Altman*, attorneys; *Mr. Altman* and *Elsie Elizabeth Sweetser*, of counsel and on the brief).

*Joseph C. Mahon* argued the cause for respondents Eric B. Ryan and Hillary A. Ryan (*Hill Wallack*, attorneys).

The opinion of the Court was delivered by

VERNIERO, J.

This appeal involves a dispute among the offspring of J. Seward Johnson (Seward Sr.), son of the founder of the Johnson & Johnson corporation. It is one of many such disputes involving trusts or trust property that have arisen within the Johnson family over the past three decades. See *Hill v. Estate of Richards*, 142 *N.J.* 639, 667 *A.*2d 695 (1995); *Wiedenmayer v. Johnson*, 106 *N.J.Super.* 161, 254 *A.*2d 534 (App.Div.), *aff'd sub nom. Wiedenmayer v. Villanueva*, 55 *N.J.* 81, 259 *A.*2d 465 (1969).

Seward Sr.'s son, John Seward Johnson, Jr. (Seward Jr.), divorced his first wife in 1965. During the divorce proceeding, Seward Jr. acknowledged in writing that he was the father of Jenia Anne Josephine Johnson (Jenia). That acknowledgment is consistent with Jenia's birth and baptismal certificates, each of which identifies the child's father as Seward Jr. At the conclusion of the proceeding, the trial court found as fact that Seward Jr. was Jenia's father and entered judgment accordingly.

Some thirty-five years after entry of that judgment, we are called on to determine whether Jenia's parentage may be collaterally attacked by third parties seeking to defeat her existing status

as an eligible beneficiary under a trust established by Seward Sr. in 1961. The trial court foreclosed the third-party challenge, concluding that the prior adjudication of Seward Jr.'s paternity applied to the present administration of the trust. The Appellate Division disagreed, remanding the matter for further proceedings. We now reverse.

I.

The complete history of this case is extensive. We recite only those facts that are pertinent to this appeal. Seward Jr. married Barbara Eisenfuhr in Virginia City, Nevada, on September 16, 1956. Two years later, Seward Jr. adopted Barbara's son, Bruce Alexander, who was born of a previous marriage. On January 11, 1961, Mrs. Johnson gave birth to Jenia in Princeton, New Jersey. Seward Jr. is listed as Jenia's father on her birth certificate, as well as on a May 20, 1961, baptismal certificate. (The parties variously refer to Jenia as Jenny Anne or Jennie Anne Josephine Johnson, Kookie Johnson, and Jeniah Johnson. We refer to her as Jenia, the first name listed on her birth certificate.)

On December 20, 1961, Seward Sr. created an irrevocable charitable trust (the 1961 trust), naming four of his six children and eleven grandchildren as the trust's measuring lives. In a trust instrument, a "measuring life" refers to the lives of individuals named by a grantor whose death as a group would terminate the trust. The 1961 trust expressly names Jenia for that purpose.

The trust was funded with 4,600 shares of Johnson & Johnson common stock. The trust directs the trustees to pay all net trust income to "educational, religious, or charitable organizations" until the earlier of January 10, 1997, or the deaths of Seward Sr.'s four named children and eleven named grandchildren. Thereafter, the trust authorizes the trustees, in their "absolute and uncontrolled discretion," to distribute the trust's proceeds to Seward Sr.'s four children, Mary Lea Johnson Ryan, Elaine Johnson Wold, Seward Jr., and Diana Melville Johnson Stokes, "their spouses, and their

issue, or any one or more of them[.]" The trial court summarized the trust's distribution provisions as follows:

All of the net income from the 1961 Trust has been paid to charitable organizations since its creation on December [20], 1961. On January 10, 1997, the mandatory charitable phase of the Trust will conclude. Thereafter, the Trustees are authorized, in their absolute and uncontrolled discretion ... whenever they deem it to be for his or her best interests ..., to pay any and all of the income and corpus of the Trust "to and among the Grantor's four children ..., their spouses, and their issue, or any one or more of them ...." The Trust provides for its termination "upon the death of the last to survive of the Grantor's ... four children ... and the Grantor's eleven [named] grandchildren ..." and for the distribution of any remaining property, to the Grantor's children and their issue based upon a formula of survivors at a generational level.

As defined in the 1961 trust, "issue" includes "an adopted child and children[.]" Under the trust, Jenia would be considered the issue of Seward Jr. for purposes of distribution unless her parentage was successfully contested. Because several of the persons named as measuring lives are still living, the mandatory charitable phase of the trust concluded on January 10, 1997. According to the Appellate Division, the value of the trust is estimated at $350,000,000.

Seward Jr. filed a complaint for divorce in 1962, asserting as grounds his wife's alleged cruelty (which included allegations of desertion) and adultery. To prove the adultery claim, Seward Jr. sought and obtained an order from the Chancery Division directing that Jenia and the parties submit to blood tests in advance of trial. The Appellate Division reversed that directive, concluding that it was premature. In an opinion written by Judge Conford, the court stated that

an infant, as ward of the court acting as *parens patriae*, is entitled to its discretionary protection from the threats in respect of its legitimacy and property rights involved in the taking of blood grouping tests in these circumstances unless and until no alternative is left to such action in the performance of the court's paramount objective to ascertain the truth in order to do justice in deciding the controversy between the parties hereto.

The panel remanded the matter, directing that the trial court consider other evidence of Mrs. Johnson's alleged adultery prior to considering Seward Jr.'s blood-test application.

Thereafter, Seward Jr. admitted that he was Jenia's father and signed a document entitled "ACKNOWLEDGMENT OF PATERNITY." That acknowledgment states in relevant part: "TO WHOM IT MAY CONCERN: The Undersigned, JOHN SEWARD JOHNSON, JR.... hereby unequivocally acknowledges paternity of Jennie Anne Josephine Johnson ... born of Barbara E. Johnson at Princeton, New Jersey, on January 11, 1961." The document was signed, witnessed, and notarized on March 3, 1965.

The trial court granted the divorce on the ground of Mrs. Johnson's desertion. The court also made several findings of fact, including "[t]hat Jennie Anne Josephine Johnson was duly born of the marriage." Additionally, the judgment *nisi* entered at the conclusion of the proceedings provides that "the paternity of [Seward Jr.] as the father of the infant, Jennie Anne Josephine Johnson, born January 11, 1961, is hereby adjudicated." (A judgment *nisi* is an interim decree that ripens into a final judgment unless challenged. *Black's Law Dictionary* 944 (5th ed.1979).) Because neither Seward Jr. nor Barbara Johnson contested the judgment *nisi*, it became final on June 14, 1965. The marriage of the parties dissolved on that date.

In 1968, in connection with a dispute involving an unrelated 1944 trust, see *Weidenmayer, supra,* 106 *N.J.Super.* 161, 254 *A.*2d 534, Seward Jr. testified, "I do not consider these [Barbara Johnson's children] my children.... These are children of other men. This is my position." That apparent disavowal of Jenia's paternity, however, was not adjudicated by any court. Years later, on September 28, 1977, in an earlier phase of the administration of the 1961 trust, Seward Jr. again represented that he was Jenia's father. In that action, he petitioned the court to appoint a guardian *ad litem* for all of his children, including Jenia. The petition, signed by Seward Jr., unambiguously states that he "is the father of Jenny Anne Josephine Johnson[.]"

After his son began divorce proceedings, but before the court entered the divorce decree, Seward Sr. created another charitable trust on December 31, 1963 (the 1963 trust). That trust was

funded with 12,730 shares of Johnson & Johnson common stock. The provisions of the 1963 trust generally track the language of the 1961 trust, except that the 1963 trust expressly excludes Jenia and her half-brother, Bruce Alexander, as distributees. Specifically, the 1963 trust provides "that no child born to or adopted by the Grantor's son, JOHN SEWARD JOHNSON, JR., during his marriage to BARBARA E. JOHNSON (including specifically but not in limitation thereof BRUCE ALEXANDER JOHNSON and JENNY ANNE JOSEPHINE JOHNSON) and no issue of any such child shall be included as a distributee[.]"

During the course of their administration of the 1961 trust, the trustees filed nine intermediate accountings. Throughout those accountings, the trustees named Jenia as a grandchild of Seward Sr., i.e., "issue" of Seward Jr., and in so doing, they presumably considered her to be an eligible beneficiary under the trust. At no time in the prior accountings did anyone challenge Jenia's status under the 1961 trust.

The trustees filed a verified complaint with the Chancery Division for settlement of the ninth intermediate accounting on March 27, 1996. Because the trust's January 10, 1997, expiration date was approaching, the trustees sought instruction from the court on several subjects, including the interpretation of the term "issue" and who comprised that class, and whether the trustees' understanding of the class of beneficiaries was correct.

At the initial case conference, Seward Jr., his second wife, and their two children, John Seward Johnson III and Clelia Constance Johnson, challenged Jenia's inclusion as a member of the class of eligible beneficiaries under the 1961 trust. Jenia's cousins, Eric Bruce Ryan and Hillary A. Ryan (the Ryans), children of Seward Jr.'s deceased sister, made a similar challenge. In a letter to the trial court, the trustees expressed the view that the paternity contest might be resolved as a matter of law, thereby avoiding lost time and expense. The trustees reiterated that position at the second case conference. The trial court agreed, directing that Jenia move for partial summary judgment on the issue of paterni-

ty. Jenia complied, seeking confirmation of her status as an eligible beneficiary under the 1961 trust and requesting that discovery regarding that subject be precluded.

In an unreported opinion and subsequent order, the trial court granted partial summary judgment in favor of Jenia. The court held that Jenia's status as a child of Seward Jr. was conclusively established as a matter of law in 1965. The court further determined that Jenia was an eligible beneficiary under the 1961 trust, and that all other parties were precluded from seeking discovery relating to that issue. In so ruling, the trial court concluded that the twenty-three-year limitations period found in the New Jersey Parentage Act, *N.J.S.A.* 9:17–38 to –59 (the Act), served as a statute of repose that barred any challenge to the 1965 determination of Seward Jr.'s paternity. The court considered the Act to be the exclusive method for determining paternity, thus confirming that Jenia was "a child of J. Seward Johnson, Jr."

Before the Appellate Division, the Ryans, Seward Jr., and his immediate family argued that the trial court erred in its ruling in respect of the Parentage Act and raised other issues. In an unreported opinion, the Appellate Division agreed with the trial court that Seward Jr., his second wife, and their children were barred from contesting Jenia's legitimacy on account of *res judicata*, collateral estoppel, and judicial estoppel. The panel disagreed, however, with the trial court's interpretation of the Act. It concluded that the Act's time limitations do not apply to actions seeking to construe the language of a will or trust.

Further, the panel rejected Jenia's argument that the Ryans lacked standing to challenge Seward Jr.'s paternity. The panel also reasoned that laches did not bar that challenge because if made earlier, the challenge to Seward Jr.'s paternity would have been rejected as premature. The panel remanded the matter to the trial court to determine whether Jenia "is 'issue' [of Seward Jr.] and whether [Seward Sr.] might have intended her to benefit even if she were not the child of Seward, Jr."

The Appellate Division disposed of other issues not pertinent to this appeal. We granted Jenia's petition for certification, limited to the parentage issue, and granted a nearly identical petition filed by the appointed guardian *ad litem* of Jenia's son, Henry Bruce Sheeran. 163 *N.J.* 77, 747 *A.*2d 286 (2000). We denied the cross-petition, filed by John Seward Johnson III and Clelia Constance Johnson, challenging that part of the Appellate Division's decision barring them from contesting their father's paternity of Jenia. 163 *N.J.* 78, 747 *A.*2d 286 (2000). Our sole focus is on whether the Ryans or similarly situated persons may challenge Jenia's parentage and beneficiary status within the context of the administration of the 1961 trust.

## II.

The Court resolves this dispute by analyzing the interplay among the policies undergirding the Parentage Act and certain other principles. We also address the doctrine of probable intent, as well as the Ryans' claim that principles of fundamental fairness or due process require that they be permitted to contest Jenia's parentage.

## A.

We begin our analysis by reciting the longstanding precept that "a child born in wedlock is presumed to be the legitimate offspring of the husband and wife." *Sarte v. Pidoto,* 129 *N.J.Super.* 405, 410, 324 *A.*2d 48 (App.Div.1974). That principle has deep roots in New Jersey, *Wallace v. Wallace,* 73 *N.J. Eq.* 403, 67 *A.* 612 (E. & A.1907), was reaffirmed in this jurisdiction at about the time of Jenia's birth, *In re Adoption by K.,* 92 *N.J.Super.* 204, 222 *A.*2d 552 (Cty.Ct.1966), and is widely recognized in jurisdictions throughout the country. See *Kowalski v. Wojtkowski,* 19 *N.J.* 247, 254–61, 116 *A.*2d 6 (1955) (tracing history of rule from law of England in 1777); 41 *Am.Jur.*2d *Illegitimate Children* § 10, at 212 (1995) ("The principle that children born in wedlock are

presumed to be legitimate is universally recognized.") (footnote omitted).

The common-law presumption of legitimacy sought to avoid the effects of the doctrine of *nullius filius* (the child of nobody), an ancient tenet that essentially treated an illegitimate child as a non-person in the eyes of the law. As explained in a prior opinion of this Court:

> At common law, the putative father was under no obligation to maintain his illegitimate offspring. The duty of support came by statute: first, on the motion of the overseer of the poor or other local representative to exonerate the municipality, and then at the instance of the mother or other interested person on behalf of the child itself, the latter a measure of relief conforming with others of the same pattern to a more enlightened concept of social justice as against the harsh medieval doctrine of *nullius filius* that, for the moral sin of the parents, set the unfortunate and innocent victim adrift with no standing whatever before the law.
> [*Kowalski, supra,* 19 *N.J.* at 254, 116 *A.*2d 6.]

In 1983, the Legislature enacted the New Jersey Parentage Act, which is modeled after the Uniform Parentage Act promulgated by the National Conference of Commissioners on Uniform State Laws. *Statement of the Assembly Judiciary, Law, Public Safety and Defense Committee on Senate Bill No. 888, L.* 1983, *c.* 17, *reprinted in* comments to *N.J.S.A.* 9:17–38 (*Legislative Statement*). In enacting that statute, the Legislature "intended to establish the principle that regardless of the marital status of the parents, all children and parents have equal rights with respect to each other and to provide a procedure to establish parentage in disputed cases." *Ibid.* See also *Wingate v. Estate of Ryan,* 149 *N.J.* 227, 233, 693 *A.*2d 457 (1997) (describing history of Act).

In furtherance of those aims, the Act contains numerous provisions, including those establishing the methods by which the parent-child relationship may be proved, *N.J.S.A.* 9:17–41, providing for the confidentiality of proceedings brought under the Act, *N.J.S.A.* 9:17–42, establishing the jurisdiction of the Superior Court and providing for the joinder of certain other actions, including divorce actions, *N.J.S.A.* 9:17–46, authorizing the court to admit evidence of blood or genetic tests, *N.J.S.A.* 9:17–48, and establishing certain burdens of proof, *N.J.S.A.* 9:17–43.

■ Significant to this dispute, the Act identifies certain presumptions of paternity, one of which mirrors the common-law principle that a child born in wedlock is presumed to be the legitimate offspring of the husband. In that regard, the statute provides: "A man is presumed to be the biological father of a child if ... [h]e and the child's biological mother are or have been married to each other and the child is born during the marriage, or within 300 days after the marriage is terminated by death, annulment or divorce[.]" *N.J.S.A.* 9:17–43a(1). As indicated by the legislative history, "[t]hese presumptions are intended to facilitate the flow of benefits from the father to the child." *Legislative Statement.*

Grounded in statute and steadied by its ancient roots, the presumption of legitimacy "remains one of the strongest rebuttable presumptions known to the law, and the interests of society require that it be given effect unless overcome by the strongest sort of evidence, in the absence of which the presumption remains conclusive." 41 *Am.Jur.*2d *Illegitimate Children* § 10, at 213 (1995) (footnotes omitted). Under the Act, the presumption "may be rebutted in an appropriate action only by clear and convincing evidence." *N.J.S.A.* 9:17–43b. That, too, is essentially a codification of the common law. For a party to have succeeded in proving under the common law that a child born in wedlock was illegitimate, "there [had to] be no possible escape from [that] conclusion[.]" *Wallace, supra,* 73 *N.J. Eq.* at 403, 67 *A.* 612. Our courts have vigilantly sustained the presumption in numerous contexts. *See, e.g., In re Adoption by K., supra,* 92 *N.J.Super.* at 207, 222 *A.*2d 552 (holding that mother's written representation to adoption agency that her former husband was not her child's father is insufficient to rebut presumption of paternity); *In re Estate of Rogers,* 30 *N.J.Super.* 479, 486, 105 *A.*2d 28 (App.Div.) (concluding that presumption was not rebutted in case in which child's putative father acknowledged paternity to four witnesses and was alleged to be "bedmate" of child's mother), *certif. denied,* 16 *N.J.* 193, 107 *A.*2d 835 (1954).

The Act's limitations provision states in part that "[n]o action shall be brought under [the Act] more than five years after the child attains the age of majority." *N.J.S.A.* 9:17–45b. We have previously observed that "[t]hat section effectively imposes a twenty-three-year statute of repose for actions under the Parentage Act, running from the child's date of birth." *Wingate, supra,* 149 *N.J.* at 233, 693 *A.*2d 457. As noted, the Act also requires that paternity actions "shall be joined with an action for divorce," *N.J.S.A.* 9:17–46a, a provision that "demonstrates a specific [legislative] intent to have the issue of parentage . . . , if known to the parties at the time, resolved during the divorce proceeding." *B.P. v. G.P.,* 222 *N.J.Super.* 101, 106, 536 *A.*2d 271 (App.Div.), *certif. denied,* 108 *N.J.* 579, 531 *A.*2d 1354 (1987).

Perhaps most important to our analysis, the Act provides that "[t]he judgment or order of the court or a Certificate of Parentage determining the existence or nonexistence of the parent and child relationship is determinative for all purposes." *N.J.S.A.* 9:17–53a. The statute also provides that the relationship between the child and biological father "may be established by proof that [the father's] paternity has been adjudicated under prior law[.]" *N.J.S.A.* 9:17–41b. Lastly, the statute provides that "[t]he adjudication of paternity shall only be voided upon a finding that there exists clear and convincing evidence of: fraud, duress or a material mistake of fact, with the burden of proof upon the challenger[.]" *Ibid.*

We discern from those provisions that the Legislature intended the Act to provide a set of clearly defined and uniform procedures for establishing parentage in disputed cases. The Act's language and history make clear that the main thrust of the statute is to foster, not thwart, the parent-child relationship. We are thus guided by that purpose, particularly when both parents have acknowledged the father's paternity in a judicial proceeding and the issue has been conclusively adjudicated. See *M.F. v. N.H.,* 252 *N.J.Super.* 420, 425, 599 *A.*2d 1297 (App.Div.1991) (analyzing Act "in light of the strong public policy favoring the preserving of

the family unit when neither the mother nor her husband [has] in any way disavowed the husband's paternity of the child").

B.

Against that backdrop, the Ryans assert that the Appellate Division correctly remanded this matter for trial to determine both Jenia's parentage and Seward Sr.'s probable intent in respect of Jenia's eligibility to receive a share of proceeds under the 1961 trust. In their brief, the Ryans frame the question this way: Whether Seward Sr. intended to include within the class of eligible beneficiaries "a person who is not the natural, biological, blood issue of his son[.]" They argue that recent amendments to the Parentage Act and the Probate Code, *N.J.S.A.* 3B:1–1 to 3B:29–1, demonstrate the Legislature's intent to afford affected parties in their position an opportunity for a judicial determination of the parent-child relationship. To deny them that opportunity, the Ryans assert, would be fundamentally unfair.

We disagree. In *Wingate*, the plaintiff in a contested probate action sought to establish the putative father's paternity rather than challenge, as the Ryans do here, a prior adjudication of paternity. The putative father in *Wingate* died intestate. Until just before that death, the plaintiff believed that she was the biological child of another man. *Wingate, supra,* 149 *N.J.* at 229, 693 *A.*2d 457. Because the plaintiff's claim was filed more than twenty-three years after her birth, the Appellate Division concluded that the limitations period in the Parentage Act applied, thereby barring her claim. *Ibid.*

We reversed. After reviewing the legislative histories of the Parentage Act and Probate Code, we concluded that the Act's limitations provision did not affect the timeliness of the plaintiff's action brought under the Probate Code. *Id.* at 232, 693 *A.*2d 457. We stated that the Probate Code "allows an out-of-wedlock child of a deceased parent to file an heirship claim with the personal representative of the decedent's estate within the time the court has deemed reasonable for the filing of claims." *Id.* at 243, 693

*A.*2d 457. Because there was no dispute over whether the plaintiff had filed her probate claim within a reasonable time, we permitted that claim to proceed. *Ibid.*

▇▇▇ Subsequent to our decision in *Wingate,* the Legislature amended the Parentage Act to clarify that the Act's limitation provision "does not . . . limit any time period for the determination of any claims arising under the laws governing probate, including the construction of wills and trust instruments." *L.* 1997, *c.* 376, § 2 (codified at *N.J.S.A.* 9:17–45f). The Probate Code was similarly amended to provide that "[t]he parent and child relationship may be established . . . regardless of the time limitations set forth in [the Parentage Act]." *L.* 1997, *c.* 376, § 1 (codified at *N.J.S.A.* 3B:5–10).

Because those amendments authorize a potential heir of a decedent to contest a will or a trust in the context of a probate proceeding, the Appellate Division here reasoned that third parties in a like proceeding may collaterally attack an adjudication of parentage made in an earlier divorce action. We reject that reasoning. We interpret *Wingate* and the amendatory enactments more narrowly to apply principally to parties seeking to establish or confirm their parentage, as opposed to those seeking to defeat the established parentage of others. *See Wingate, supra,* 149 *N.J.* at 240, 693 *A.*2d 457 (noting that legislative approach reflected in Probate Code is intended "to make it easier, not harder or impossible, for persons born out of wedlock to establish heirship").

▇▇▇ Moreover, we agree with the trial court that the Parentage Act essentially forecloses a third-party attack on Jenia's parentage. The Act broadly accepts proof of paternity as "adjudicated under prior law," *N.J.S.A.* 9:17–41b, as well as in a host of other settings. We interpret that provision to capture within its purview the prior adjudication of Seward Jr.'s paternity. Even if the Court assumes that the statute is susceptible to different interpretations in that respect, we would reach the same conclusion in view of the Act's legislative history and "the 'fundamental purpose for

which the legislation was enacted.' " *Township of Pennsauken v. Schad*, 160 *N.J.* 156, 170, 733 *A.*2d 1159 (1999) (quoting *N.J. Builders, Owners & Managers Ass'n v. Blair*, 60 *N.J.* 330, 338, 288 *A.*2d 855 (1972)).

■ Nor are we persuaded that the doctrine of probable intent requires a contrary conclusion or further proceedings. Briefly stated, that doctrine provides that

[i]n ascertaining the intention of [the] settlor the "primary inquiry" must be directed to "the language of the instrument itself." In so doing, we seek "to ascertain and give effect to the *probable* intention of the settlor." When the instrument itself fails to indicate intent, "resort may be had to extrinsic evidence to determine the terms of the trust." ... If the language [is] clear, and no ambiguity [is] asserted, the court would confine itself to giving effect to the language used.

[*In re Trust of Voorhees*, 93 *N.J.Super.* 293, 298–99, 225 *A.*2d 710 (App.Div.1967) (internal citations omitted).]

■ We agree with the trial court that the doctrine of probable intent is not implicated in a case in which a trust document is clear on its face and a child's parentage has been conclusively adjudicated. As noted, the 1961 trust defines "issue" to include an "adopted" child. Thus, Seward Sr. contemplated that the proceeds of the trust might be distributed to persons other than his blood kin. Moreover, by expressly excluding Jenia and Bruce, her half-brother, from the 1963 trust, Seward Sr. exhibited an ability to express himself with precision and care insofar as distributions are concerned.

As stated earlier, the 1961 trust was created prior to the adjudication of Seward Jr.'s paternity. Arguably, Jenia's parentage was open to some question at the time Seward Jr. filed for divorce in 1962. The Ryans thus assert that Jenia's exclusion from the subsequent 1963 trust indicates that Seward Sr. did not intend Jenia to be a beneficiary under the 1961 trust. That argument is plausible but insufficient to overcome the clear language of the 1961 trust. We must consider that language in view of Jenia's presumptive legitimacy, which existed when the grantor executed the 1961 trust and which the 1965 adjudication resolved.

We note also that, although Seward Sr. excluded Jenia and Bruce from the 1963 trust, he did so by referring to them as children "born to or adopted by" Seward Jr. We agree with the trial court that such a reference is consistent with the children's status as offspring of Seward Jr. The Court is satisfied that the inference, suggested by the Ryans concerning the two trusts, forms an insufficient basis on which to question the grantor's intent, which is unambiguously reflected in the 1961 trust.

In sum, the 1965 adjudication of Seward Jr.'s paternity effectively bars this current challenge. The claims or intimations of third parties, or of Seward Jr. himself, that Jenia is not his daughter or that she has developed a parent-child relationship with a man other than Seward Jr., are insufficient to pierce the prior judgment. That the Legislature intended paternity disputes to be resolved definitively is reflected in its chosen language providing for judgments or orders of the court to be "determinative for all purposes." *N.J.S.A.* 9:17–53a.

■ Moreover, because Jenia's parentage has been established as a matter of law, the inquiry concerning the grantor's intent is no longer relevant absent clear language to the contrary within the trust document. Under those circumstances, the Court must "confine itself to giving effect to the language used [in the trust]." *In re Trust of Voorhees, supra,* 93 *N.J.Super.* at 299, 225 *A.*2d 710. In so doing, we find nothing in the language of the 1961 trust that would cause the Court to alter Jenia's beneficiary status or would otherwise warrant a third-party attack on her parentage.

### III.

■ Our conclusion is buttressed by the policies undergirding the Parentage Act and is consistent with principles of fundamental fairness and due process. Although the social opprobrium once associated with being a child born out of wedlock has dissipated, the presumption in favor of legitimacy remains strong. Courts in this and other jurisdictions continue to rely on that presumption to "promote[ ] our 'oft-expressed policy of supporting the integrity of

the family unit and protecting the best interests of the child ...
[and the] child's right to family identification[.]' Similarly, the
doctrine furthers our public policy of favoring the establishment of
legal parenthood with all of its accompanying responsibilities." *W.
v. W.,* 248 *Conn.* 487, 728 *A.*2d 1076, 1083 (1999) (internal citation
omitted).

The policy favoring the integrity of the family unit is
especially compelling in cases in which there has been a prior
adjudication or acknowledgment of paternity. In that regard, we
agree with the Ohio Supreme Court:

> In those cases where, by force of events, judicial intervention occurs, where the
> matter of parentage is determined with finality and in the absence of fraud, and
> where that determination is not later vacated, either on direct appeal or pursuant
> to a recognized legal remedy such as that set forth [in the rule granting relief from
> a judgment or order], the policy of this state requires, in sum, that the parent-child
> relationship be shielded from the unsettling effects of further judicial inquiry, and
> that relitigation of parentage be barred, as a general rule, in any subsequent
> actions, including those initiated under [the Ohio parentage provisions].

[*In re Gilbraith,* 32 *Ohio St.*3d 127, 512 *N.E.*2d 956, 961 (1987).]

We have found no case precisely analogous to this one. As a
general rule, however, courts in other jurisdictions appear to
agree that third-party challenges to paternity and legitimacy
should be barred once those questions have been resolved by
acknowledgment or agreement of the putative parents or by
judicial decree. *See, e.g., Jenkins v. Aetna Cas. & Sur. Co.,* 158
*So.* 217, 220 (La.Ct.App.1935) (stating that " '[i]f the husband and
his heirs cannot dispute ... legitimacy ..., for a stronger reason
the door should be closed on third parties in actions for money or
property' ") (citation omitted); *Deatherage v. Phipps,* 441 *P.*2d
1020, 1023 (Okla.1967) (concluding that, in case in which neither
husband nor wife disputed legitimacy of child born in wedlock,
third party was barred from doing so); *Byrd v. Travelers Ins. Co.,*
275 *S.W.*2d 861, 863–64 (Tex.Civ.App.1955) (observing that "[i]f the
father renounces the right to bastardize his alleged son, either
expressly or tacitly, it is extinguished and can never thereafter be
exercised by anyone").

The decision in *Knauer v. Barnett*, 360 *So.*2d 399 (Fla.1978), is particularly instructive. In that case, the trustee of an *inter vivos* trust sought a declaratory judgment to determine to whom he should distribute the trust's income and corpus. The trust document provided that the trustee distribute such property to the "blood issue" of the settlor or, if there were no such issue, to the settlor's "collateral kindred." *Id.* at 401. Charles Barnett claimed to be the son and blood issue of the settlor, William Barnett. *Ibid.* Other relatives disputed that claim, asserting that the settlor had no blood issue and, consequently, that they were entitled to the entire trust distribution. *Ibid.*

Charles was born in Paris, France, to Marcelle Perron and was identified in both the official civil and church records as "Charles Perron." *Ibid.* Five years later, William Barnett and Marcelle appeared before the deputy mayor of Paris and declared in the presence of witnesses that they recognized Charles "as their son[.]" *Ibid.* William and Marcelle then married. *Ibid.* Charles's birth record was thereafter corrected by an official striking through the name "Perron" and writing above it the name "Barnett." *Id.* at 402. Later, William and Marcelle swore before a notary public that a petition prepared for filing with the French government was true in stating that Charles has been "acknowledged by the said William L'Engle Barnett as his son." *Ibid.* Several years later, after Charles and his parents became estranged, William began referring to Charles as his "adopted son" or "step-son" and purportedly stated that "[t]here's not a drop of my blood in that boy." *Id.* at 402–03.

Based on that record, the circuit court concluded that Charles was not the blood issue of William and thus, Charles was not entitled to receive any of the trust's income or corpus. The district court reversed. In affirming that reversal, the Florida Supreme Court stated:

> To permit the collateral kindred of William to challenge the parentage of Charles ... is not supported by ... policy considerations and would seriously undermine

360

the status of every child born out of wedlock who is subsequently legitimatized by acknowledgment and intermarriage pursuant to [Florida's probate statutes].

. . . .

This Court is cognizant of the well-established principle that the intent of the settlor of a trust is controlling. However, unless the trust instrument is ambiguous the intent of the settlor must be ascertained from that which lies within the four corners of the instrument itself, and no extrinsic evidence of the settlor's intent is admissible. . . . No ambiguity is created by an application of the legal definition to the term "blood issue," as used in the trust instrument in question. By virtue of William's compliance with the [Florida statutes], Charles was rendered, by operation of law, the "blood issue" of William. The trust contains no expressed intent to exclude Charles from the definition of this term. Consequently, the district court properly concluded that Charles Barnett, as the blood issue of William Barnett, was entitled to distribution of the trust assets and that the extrinsic evidence relied upon by the circuit court below in ruling that Charles is not the blood issue of William was irrelevant to this determination.

[*Id.* at 405–06 (citations omitted).]

(We note for completeness that a portion of the Florida statute relied on by the court in *Knauer* has been revised by the Legislature of that state. See *Thurston v. Thurston,* No. 1D97–692, 2000 WL 1838640 (Fla.App.Ct.2000). The court's rationale in support of its holding, however, remains instructive.)

■ Although not an exact analogue, *Knauer* resembles this case. Here, as in *Knauer,* third parties raise the specter of probable intent as the principal vehicle by which to reopen a prior proceeding concerning a child born in wedlock or otherwise legitimized. The Court should not invoke the doctrine of probable intent for that purpose. Our reasons are similar to those expressed by the court in *Knauer.* We have considered the 1961 trust against the backdrop of the presumption of legitimacy that existed when Seward Sr. executed the trust document and that exists today. In so doing, the Court finds no ambiguity within the four corners of the instrument to warrant the belated questioning of the grantor's intent almost four decades later.

■ Finally, because they were not parties to Seward Jr.'s 1965 divorce action, the Ryans further argue that it would be fundamentally unfair for the Court to rely on that prior adjudication in resolving this dispute. They consider Seward Jr.'s 1965

acknowledgment of paternity to be false, executed solely to conclude the then-pending divorce litigation. The Ryans thus state in their brief that "[n]o public purpose will be served by allowing the false acknowledgment of Jennyanne's paternity to preclude the court's determination of Mr. Johnson's intent." They also assert that their right to due process would be violated if they were denied the opportunity to contest Jenia's parentage within the context of the distribution of the 1961 trust.

The doctrine of fundamental fairness " 'serves to protect citizens generally against unjust and arbitrary governmental action, and specifically against governmental procedures that tend to operate arbitrarily.' " *Doe v. Poritz*, 142 *N.J.* 1, 108, 662 *A.*2d 367 (1995) (citation omitted). We are satisfied that that doctrine does not alter our conclusion that the Ryans should be precluded from reopening the issue of Seward Jr.'s paternity. There is nothing unjust or arbitrary about preserving a prior adjudication of paternity. To the contrary, with its clear command that an adjudication of parentage "is determinative for all purposes[,]" *N.J.S.A.* 9:17–53a, the Parentage Act strongly favors the finality of such judgments.

Moreover, unverified allegations of fraud are insufficient to overcome the presumption of paternity imbedded in our law. By design, the presumption is intended to prevent rumor, innuendo, and whispers of illegitimacy from creeping into the serious process of determining paternity. See *In re Estate of Rogers, supra,* 30 *N.J.Super.* at 486, 105 *A.*2d 28 (observing that presumption of legitimacy is comparable in substance to presumption of innocence and as such, "cannot as a matter of law be demolished by proof of circumstances which create only doubt and suspicion"). As the Appellate Division aptly noted some time ago: "Both good men and [bad] men may be less so than suspected. To surmise or conjecture the illegitimacy of birth would offend the principles of our public policy and established law." *Id.* at 485, 105 *A.*2d 28.

In a similar vein, we see no violation of due process in foreclosing a third-party collateral attack on a longstanding paternity judgment. Generally, the right to due process is triggered when the complained-of action implicates certain protectible interests of the aggrieved party. *Doe, supra,* 142 *N.J.* at 106, 662 *A.*2d 367. "Due process is not a fixed concept, however, but a flexible one that depends on the particular circumstances." *Ibid.* We surmise from the Ryans' argument that their protectible interest is an asserted right to share in the distribution of the 1961 trust and that Jenia's status as an eligible beneficiary under the same trust infringes on that interest.

In essence, the Ryans' claim requires us to balance the adjudication of Jenia's legitimacy against their purported right to defeat that legitimacy and thereby increase their economic gain. In *Michael H. v. Gerald D.,* 491 *U.S.* 110, 113, 109 *S.Ct.* 2333, 2337, 105 *L.Ed.*2d 91, 99 (1989), the United States Supreme Court set aside the due process claim of a putative father who sought to establish his paternity of a child born to the wife of another man. More specifically, the putative father asserted that the presumption of the child's legitimacy infringed on his right to due process, along with the child's right to maintain a relationship with her biological father. *Ibid.* The California statute at issue provided that the presumption of legitimacy in favor of a child born in wedlock could be rebutted only by the husband or wife, and then only in certain circumstances. *Id.* at 115, 109 *S.Ct.* at 2338, 105 *L.Ed.*2d at 101.

In a plurality opinion, the Court rejected the putative father's claim. Relying in part on the same policy undergirding the presumption of legitimacy that we have noted here, four members of the Court stated that "our traditions have protected the marital family ... against the sort of claim [the putative father] asserts." *Id.* at 124, 109 *S.Ct.* at 2342, 105 *L.Ed.*2d at 106 (footnote omitted). A fifth member of the Court concurred in its judgment, observing that the marriage between the child's mother and her husband provided the child "with a loving and harmonious family home."

*Id.* at 135–36, 109 *S.Ct.* at 2348, 105 *L.Ed.*2d at 114 (Stevens, J., concurring).

We note that the purported economic right to become eligible for an unspecified share of trust proceeds occupies a lower place in the hierarchy of rights as compared to a putative father's right to the parent-child relationship. See *Santosky v. Kramer,* 455 *U.S.* 745, 758–59, 102 *S.Ct.* 1388, 1397, 71 *L.Ed.*2d 599, 610 (1982) (declaring that right of parents to raise and care for their children "is an interest far more precious than any property right"). Thus, the circumstances that justify setting aside the due process claim in this case appear more compelling than those that existed in the *Michael H.* case.

The Court is convinced that Seward Jr.'s paternity of Jenia should not be disturbed in the present setting. We note again that the asserted right to share in the proceeds of the 1961 trust is within the discretion of the trustees. When measured against Jenia's equal or greater right to family identification, the Ryans' claim for an uncertain larger share of the trust's distribution is insufficient to justify the remedies sought in this appeal. Jenia cannot be Seward Jr.'s daughter for only some purposes. By operation of law, the adjudication of Seward Jr.'s paternity cements Jenia's status as an eligible beneficiary under the 1961 trust absent clear language to the contrary within the trust itself.

### IV.

We hold that no third party may collaterally attack Jenia's parentage as previously determined in Seward Jr.'s divorce proceeding. Therefore, Jenia is an eligible beneficiary under the 1961 trust. We express no opinion concerning the distribution of funds or Jenia's share, if any, of the trust property. As noted by the trial court, those questions remain within the trustees' discretion under the terms of the trust and are not before us for review.

### V.

To the extent that it is inconsistent with our holding, the judgment of the Appellate Division is reversed.

364

*For reversal*—Chief Justice PORITZ and Justices STEIN, COLEMAN, LONG, VERNIERO, LaVECCHIA and ZAZZALI—7.

*Opposed*—None.