15 P.3d 658 (2001)
104 Wash.App. 105
Geronimo SUBIA, a single person, Respondent,
v.
Chase RIVELAND, Secretary of the Department of Corrections, Alice Payne, Superintendent of the Women's Corrections Center, Department of Corrections, and the State of Washington, Appellant.
No. 24627-9-II.
Court of Appeals of Washington, Division 2.
January 5, 2001.
*659 Robert W. Kosin, Asst Atty General, for Appellants.
William Michael Hanbey, Ditlevson, Rodgers, Hanbey & Dixon, Olympia, for Respondent.
HUNT, J.
The Washington Department of Corrections (DOC) appeals a jury verdict in favor of employee Geronimo Subia. Alleging race discrimination, Subia sued DOC for placing him on administrative leave pending investigation of an inmate's sexual misconduct accusations. DOC argues that the trial court erred in (1) refusing to grant it summary judgment; (2) excluding evidence that the accusing inmate had passed a polygraph examination; and (3) denying DOC's motion for judgment as a matter of law notwithstanding the verdict. Holding that it was error to have excluded the polygraph examination results as evidence of a non-discriminatory reason for placing Subia on leave, we reverse and remand for a new trial.

FACTS

I. EVENTS LEADING TO PLACING SUBIA ON LEAVE
In November 1988, DOC hired Native American Hispanic Subia to work as a corrections officer at the Washington Corrections Center for Women (WCCW). Subia's first assignment was in WCCW's "Special Needs Unit,"[1] where he guarded inmate Lori Tsim. In the summer of 1993, Tsim told Subia that Sergeant Bonnie Wieman and Investigator J.R. Hausner, husband and wife, "were trying to make her say some things about staff, and she didn't feel right." Subia relayed the information to his supervisor and to Wieman, but nothing was done.
Subia had an exemplary record. In September 1993, DOC provisionally promoted Subia to corrections sergeant.
Shortly thereafter, Tsim claimed that she had been "engaged in sexual activity with a *660 correction[s] officer." Hausner opened an investigation,[2] but Tsim "denied that any sexual activity had occurred."
A month later, Tsim told Subia and another corrections officer that, during her interview with Hausner, (1) Hausner had "named... Subia as someone who was allegedly involved with ... Tsim in unacceptable conduct"; (2) she had denied Hausner's allegation; and (3) she was being "harassed" by Sergeant Wieman "over these allegations." Subia reported Tsim's statements to WCCW Associate Superintendent Gary Fleming; he also told Fleming that Hausner and Wieman blamed him (Subia) for their son's dismissal from his job as a corrections officer at WCCW. Nonetheless, Fleming referred Subia's report to Hausner for further investigation.
In early 1994, Tsim gave Wieman a four-page handwritten note claiming a sexual relationship with Subia. Wieman prepared an incident report. Tsim also told another corrections officer that she had tried to keep the relationship secret because she feared Subia's reaction. Fleming questioned Tsim, who repeated that she had been sexually involved with Subia. Tsim later passed a polygraph examination concerning her repeated sexual relations with Subia.[3]
Fleming met with Superintendent Payne, who reviewed Tsim's note, the incident reports, and the polygraph examination results. Payne interviewed Tsim, who again admitted having "a sexual relationship with Mr. Subia" that "had been going on for a long time." Payne knew that Tsim had previously denied having a sexual relationship with Subia, and that Tsim was housed in the Special Needs Unit.[4]
On February 10, 1994, Payne placed Subia on "administrative reassignment to ... home" with full pay and benefits, pending an investigation of Tsim's accusations, which Subia denied. The investigation failed to uncover "facts ... substantiat[ing] misconduct." Three weeks later, after being sent home, Subia returned to work, and his promotion to sergeant became permanent.

II. TRIAL
Subia sued DOC, contending that his reassignment to home violated Washington's Law Against Discrimination (WLAD), chapter 49.60 RCW. He alleged that two Caucasian male corrections "officers were accused of similar misconduct ... but were not placed on administrative leave during the period of investigation." The trial court denied DOC's motion for summary judgment and granted Subia's motion to exclude evidence that Tsim had passed the polygraph examination.
At trial, Payne testified that, in placing Subia on administrative leave: (1) she did not recall being aware of Tsim's earlier claim that Tsim was being pressured to "make a false statement"; (2) she knew that a corrections officer had denied serving as a look-out for Subia and Tsim; (3) she did not look at Subia's personnel file or speak with his supervisors to determine whether Tsim's allegations were credible; and (4) she could have assigned Hausner to investigate Tsim's accusations before placing Subia on administrative leave.
Payne further testified that it was standard practice to send an officer home, without first making a judgment on the validity of an inmate's complaint of sexual misconduct by an officer, so that DOC could conduct an unfettered investigation.[5] She estimated that, between 1992 and 1994, 11 corrections officers had been accused of sexual misconduct, and each was placed on administrative leave. Payne denied that Subia's race played any role in her decision to place him on administrative leave.
*661 Subia testified that: (1) he believed four Caucasian officers had not been placed on administrative leave, but he did not indicate the nature of the accusations against them; (2) following his (Subia's) return to WCCW, Fleming refused to approve additional training for him; (3) he (Subia) had over 100 hours of training each year from 1994 through 1997; (4) he had received two commendations before being placed on administrative leave and seven commendations afterward; (5) he received positive employee evaluations; and (6) in late 1994, Payne and Fleming approved him for the squad leader position on WCCW's respected Emergency Response Team (ERT).
Fleming testified that his actions toward Subia were not racially motivated and that he had denied Subia's requests for additional training because there was no funding and no one available to cover for Subia. Fleming and a WCCW human resources manager testified that, from 1992 to 1995, inmates accused eight Caucasian male corrections officers of misconduct, four of which were sexual misconduct accusations. DOC had placed three of the officers on administrative leave;[6] but it had not placed on administrative leave one Caucasian officer accused of sexual misconduct.[7] Inmates had accused two racial-minority corrections officers of sexual misconduct, and DOC had placed both on administrative leave.
The jury found that race was a substantial factor in DOC's decision to place Subia on administrative leave and awarded him $50,000. The trial court entered judgment and imposed costs and attorney fees of $22,001.
DOC moved for judgment as a matter of law. See CR 50(b). The trial court denied the motion, stating:
I think the record will reveal something more than a scintilla of evidence from which the verdict could be found. Even if I found the preponderance of the evidence is against the jury verdict, I would not vacate it or throw it out because I believe the test of substantial evidence. Substantial evidence can be more than a preponderance. In this case, it is a scintilla, and I think that can be found in the record.
The trial court also noted that there had been significant credibility issues during the trial.

ANALYSIS

I. WASHINGTON'S LAW AGAINST DISCRIMINATION (WLAD)
WLAD prohibits discrimination "against any person in compensation or in other terms or conditions of employment because of ... race." RCW 49.60.180(3). Washington courts analyze racial discrimination claims using a modified burden-shifting framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), under which the plaintiff worker bears the initial burden of proving a prima facie case.[8]Marquis v. City of Spokane, 130 Wash.2d 97, 113, 922 P.2d 43 (1996). If the worker successfully establishes a prima facie case, the burden shifts to the employer to produce "a legitimate non-discriminatory reason for the challenged act." Fell v. Spokane Transit Auth., 128 *662 Wash.2d 618, 634, 911 P.2d 1319 (1996). If the plaintiff has established a prima facie case of discrimination and has also submitted "sufficient evidence" to show that the employer's asserted nondiscriminatory reason is pretext, the trier of fact may then find or infer unlawful discrimination without additional independent evidence of discrimination. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 120 S.Ct. 2097, 2109, 147 L.Ed.2d 105 (2000).

A. SUBIA'S PRIMA FACIE CASE
Here, Subia established a prima facie case of disparate treatment by showing that he, a Native American-Hispanic corrections officer, with an otherwise exemplary record, had been placed on administrative leave pending an investigation of sexual misconduct; in contrast, at least one Caucasian officer accused of sexual misconduct was not placed on administrative leave.
Subia presented the following evidence to prove that DOC's reliance on Tsim's accusations was pretext for discriminatory action against him. Subia showed that Tsim's allegations may have been three years old;[9] Tsim had controverted herself in allegedly accusing Subia of sexual misconduct; and, therefore, Tsim's most recent allegations were also likely to be false. Subia created the impression that DOC had disciplined an exemplary employee on the shaky word of an inmate complainant of dubious credibility; therefore, the jury could have concluded that DOC's real reason for Subia's administrative reassignment was race, especially when compared to DOC's treatment of a similarly accused Caucasian.

B. DOC'S NONDISCRIMINATORY REASON
DOC attempted to prove that its reason for placing Subia on leave was nondiscriminatory. Both Payne and Fleming testified that Subia's race was not a consideration; DOC had placed three of the four Caucasian corrections officers accused of sexual misconduct on administrative leave pending an investigation. DOC had also placed on administrative leave a fourth Caucasian officer accused of giving his telephone number to an inmate and attempting to provide her a magazine.
Moreover, while on administrative leave, Subia's promotion to sergeant became permanent. Subia continued to receive training, commendations, and satisfactory evaluations following his return to WCCW; and six months after Subia's return, Payne and Fleming approved him for the ERT squad leader position. These promotions and commendations tend to show that DOC valued and rewarded Subia. But DOC's evidence did not convince the jury of DOC's nondiscriminatory reason for placing Subia on administrative leave.

II. POLYGRAPH EVIDENCE
We next consider DOC's contention that the trial court erred in excluding Tsim's polygraph results from the jury's consideration. DOC argues that admission of Tsim's polygraph exam results was critical to rebut Subia's impression that Tsim's accusations were untrustworthy and to prove DOC's non-discriminatory reason for placing Subia on administrative leave. We agree.
We reverse a trial court's decision to exclude polygraph evidence under ER 403[10] "only upon a showing of abuse of discretion." Industrial Indem. Co. v. Kallevig, 114 Wash.2d 907, 926, 792 P.2d 520 (1990). Here, the trial court excluded evidence of Tsim's polygraph examination because of a concern that the jury might use it to conclude that Subia had engaged in a sexual relationship with Tsim. This, the trial court ruled, amounted to prejudice "tremendously outweigh[ing]" any probative value. But if Tsim's polygraph was such a powerful piece of evidence that it was likely to convince the jury that Subia had engaged in sexual conduct with Tsim, then it was at least as likely to have convinced DOC's Superintendent Payne that Tsim's allegations might have been true and required investigation.
*663 This case is not like State v. Reay, in which Division One observed:
"If ... the polygraph evidence is offered to establish that one party's version of the events is the truth, the polygraph evidence is being introduced for its substantive value and is inadmissible absent a stipulation."
61 Wash.App. 141, 149-50, 810 P.2d 512 (1991) (quoting Brown v. Darcy, 783 F.2d 1389, 1397 (9th Cir.1986)). Here, the central issue at trial was not whether Subia had committed sexual misconduct with an inmate. Rather, the issue was whether DOC engaged in disparate treatment and had a racially discriminatory purpose in placing Subia on administrative leave pending investigation of Tsim's allegations.
Critical to deciding this issue of fact was Payne's frame of mind and her reasons for placing Subia on leave. Tsim's polygraph, showing her accusations against Subia to be truthful, was highly relevant to the question of whether DOC's stated nondiscriminatory reason for sending Subia home was false, from which the jury could otherwise infer a racial motive. See Reeves, 120 S.Ct. at 2109. Subia had created an impression that Wieman and Hausner might have instigated the charges against Subia in retaliation for his part in their son's dismissal from employment with the DOC. What was relevant was whether DOC had legitimate reasons for investigating Tsim's allegations of Subia's sexual misconduct. And highly probative of the legitimacy of DOC's reasons were Tsim's polygraph examination results.
The ultimate question is whether the employer intentionally discriminated, and proof that "the employer's proffered reason is unpersuasive, or even obviously contrived, does not necessarily establish that the plaintiff's proffered reason ... is correct." [St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 524, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).] ...
... [I]t is permissible for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation.... "The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons will permit the trier of fact to infer the ultimate fact of intentional discrimination." Id., at 511, 113 S.Ct. 2742. Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive.
Reeves, 120 S.Ct. at 2108 (italics omitted).
With the polygraph evidence excluded, Subia, who bore the burden of proving discrimination, was able to create the impression that DOC's stated reason was false. From that, he could invite the jury to infer intentional, racial discrimination. Tsim's having passed the polygraph was highly probative, especially because her credibility was critical to DOC's decision to investigate her complaint. DOC offered the polygraph evidence to show that its decision to place Subia on administrative leave was based on Tsim's apparently truthful accusations of sexual misconduct rather than on Subia's race.
Tsim's polygraph was relevant and admissible to prove DOC's "state of mind,"[11] in much the same way that a polygraph or hearsay may be used to establish probable cause. When the trial court excluded this evidence to prevent unfair prejudice to Subia's case, it unintentionally prejudiced DOC's case by withholding a critical piece of evidence. With this evidence the jury could have found that Tsim's having passed a polygraph examination was a key factor in DOC's non-racially motivated decision to place Subia on administrative leave with pay, pending an *664 investigation. DOC is entitled to a new trial with Tsim's polygraph admitted for this limited purpose.[12]
Reversed and remanded for new trial.
SEINFELD, J., concurs.
ARMSTRONG, C.J., concurs in the result.
NOTES
[1] The unit housed "individuals who had particular special needs," including "psychological problems."
[2] "[S]ome investigating into [similar] allegations had been on going [sic] since November 1990."
[3] According to the polygraph examiner, Tsim was not "attempting deception" when she responded affirmatively to the question, "Did ... Subia have sexual intercourse with you ... more than once?"
[4] Payne was unsure whether "Tsim ha[d] psychological problems that predated her admission to [WCCW]."
[5] Payne elaborated that a guard's sexual misconduct is "a security issue" and "[t]he only way to get a clean investigation, the only way to get to the bottom of what has occurred is to have that person removed."
[6] The remaining four accusations involved: exchanges of personal information, giving a flower to an inmate, allowing inmates to swim in a pond, and looking over an inmate's shoulder. DOC had imposed administrative leave upon only the officer who had given an inmate his telephone number and had arranged for the inmate to receive a magazine.
[7] The record does not reveal the nature of the accusation.
[8] To establish a prima facie case of racial discrimination due to disparate treatment, the employee "must show (1) he belongs to a protected class, (2) he was treated less favorably in the terms or conditions of his employment (3) than a similarly situated, nonprotected employee, and (4) he and the nonprotected `comparator' were doing substantially the same work." Johnson v. Dep't of Soc. & Health Servs., 80 Wash.App. 212, 227, 907 P.2d 1223 (1996) (footnote omitted). "In addition to the McDonnell Douglas test, the federal courts have recognized that a prima facie case of discrimination can be established by showing direct evidence of discriminatory intent." Kastanis v. Educational Employees Credit Union, 122 Wash.2d 483, 491, 859 P.2d 26 (1993), amended by 122 Wash.2d 483, 865 P.2d 507 (1994). But see Hill v. BCTI Income Fund-I, 97 Wash.App. 657, 986 P.2d 137 (1999), review granted, 140 Wash.2d 1005, 999 P.2d 1261 (2000).
[9] Hausner ambiguously reported that "some investigating into allegations had been on going [sic] since November 1990."
[10] ER 403 states that relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice."
[11] See Hardie v. Cotter & Co., 849 F.2d 1097, 1101 (8th Cir.1988) (documents offered in wrongful discharge case, not to prove truth of material contained within, but to demonstrate employer's state of mind, admissible); Cameron v. Bd. of Educ. of the Hillsboro City Sch. Dist., 820 F.Supp. 336, 337 (S.D.Ohio 1993) (complaints against employee considered to show that complaints had been made and their bearing on employer's decision) Hollingsworth v. Wash. Mut. Sav. Bank, 37 Wash.App. 386, 393, 681 P.2d 845 (1984) (employment case, out-of-court statements pertinent to prove mental or emotional state of person who heard or read them).
[12] Because we reverse and remand for new trial, we need not reach the issue of whether the trial court erred in denying DOC's motion for JNOV.