# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
## DIVISION ONE

WANDA MONTGOMERY, personal )
representative of the Estate of the )  No. 73447-4-I
deceased, DESHAWN MILLIKEN, )
)
               Respondent, )  ORDER WITHDRAWING OPINION
)  AND SUBSTITUTING OPINION
)
      and )
)
DESTINY MILLIKEN, the sister of the )
deceased, DESHAWN MILLIKEN, )
)
               Plaintiff, )
)
      v. )
)
BREWHAHA BELLEVUE, LLC, d/b/a )
MUNCHBAR, a Washington Limited )
Liability Company, and KEMPER )
DEVELOPMENT COMPANY, a )
Washington Corporation, )
)
               Appellants. )

The court has determined that the opinion filed on August 8, 2016, should

be withdrawn and a substitute opinion be filed. Now, therefore, it is hereby

ORDERED that the opinion filed on August 8, 2016, be withdrawn and a

substitute opinion be filed.

DATED this 19th day of September, 2016.

Trickey, ACJ

Appelwick, J

Cox, J.

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

WANDA MONTGOMERY, personal
representative of the Estate of the
deceased, DESHAWN MILLIKEN,

        Respondent,

and

DESTINY MILLIKEN,† the sister of the
deceased, DESHAWN MILLIKEN,

        Plaintiff,

        v.

BREWHAHA BELLEVUE, LLC, d/b/a
MUNCHBAR, a Washington Limited
Liability Company, and KEMPER
DEVELOPMENT COMPANY, a
Washington Corporation,

        Appellants.

No. 73447-4-I

DIVISION ONE

UNPUBLISHED OPINION

FILED: September 19, 2016

TRICKEY, A.C.J. — The estate of DeShawn Milliken successfully sued Brewhaha, LLC ("Munchbar") for wrongful death, claiming DeShawn's daughter, Ta'riyah Smith-Milliken, as a statutory beneficiary. Munchbar contends the trial court erred when it concluded on summary judgment that Ta'riyah's birth certificate and an acknowledgment of paternity from Arizona establish paternity for purposes of the wrongful death beneficiary statute. It also argues the trial court abused its discretion when it excluded evidence of DeShawn's character and failed to provide adequate jury instructions.

---

† The appellants have filed a motion to withdraw respondent Destiny Milliken as a party from the appeal. The respondents have filed a response and have no objections. Accordingly, the appellants' motion is granted.

Because the acknowledgment of paternity and Ta'riyah's birth certificate are presumptively valid, we grant them full faith and credit and conclude they establish DeShawn's paternity for purposes of the wrongful death beneficiary statute. We further conclude the trial court did not abuse its discretion when it excluded evidence of DeShawn's character, nor did the court provide any erroneous jury instructions. We affirm.

## FACTS

The Munchbar was a popular sports bar in Bellevue, Washington. On the night of December 23, 2012, DeShawn Milliken and his sister Destiny went to the Munchbar to celebrate a friend's birthday. The crowd at the Munchbar was larger than usual because the Seattle Seahawks had beaten the San Francisco 49ers the same day, and Seahawks players were known to occasionally attend the Munchbar. Despite the increased attendance, Munchbar had only five or six security officers present when typically they required eleven or twelve for large crowds.

Munchbar admitted several people into the club without checking their identification to verify they were over the age of 21 and without checking for weapons. One person who entered was Ja'Mari Jones, who was 19 years old and had a loaded handgun. Destiny[1] knew Jones and believed he had burglarized her mother's home and stolen $100,000 from DeShawn. A fight broke out between DeShawn and Jones.

---

[1] Because Destiny Milliken, DeShawn Milliken, and Ta'riyah Smith-Milliken share similar last names, we refer to them by their first names to avoid confusion.

DeShawn's friend Louis Holmes also attacked Jones. Jones fired four or five shots, killing DeShawn and wounding two others.

In November 2013, DeShawn's estate and Destiny sued Munchbar. Among the plaintiffs' other claims, DeShawn's estate sought damages for his wrongful death, claiming DeShawn's daughter Ta'riyah Smith-Milliken as a statutory beneficiary. Munchbar moved for summary judgment, arguing that DeShawn's estate had no qualifying statutory wrongful death beneficiary as defined by RCW 4.20.020. Munchbar contended that Ta'riyah was not DeShawn's "child" for purposes of the statute.

Indeed, DeShawn is not Ta'riyah's biological father, nor did he adopt her. DeShawn dated Ta'riyah's mother, Denise Gilbert, during college in Arizona. They eventually separated but remained friends. DeShawn moved from Arizona to Atlanta, Georgia in late 2005. Gilbert became pregnant with Ta'riyah in early 2006, but the father died before she was born. Ta'riyah was born in December 2006. In February 2007, DeShawn began visiting Gilbert and Ta'riyah every month or every other month. He eventually moved back to Arizona before Ta'riyah's first birthday in December 2007. DeShawn and Gilbert began dating again, but they separated in 2009.

During this period, Ta'riyah considered DeShawn to be her father and called him "dad." CP at 1915. After Gilbert and DeShawn separated, Deshawn told Gilbert he still "want[ed] to be in [Ta'riyah's] life." CP at 1915. Gilbert told Deshawn "Don't come in and out of her life. If you're going to be here, then let's be here, let's try to do adoption, do what we need to do." CP at 1915. They developed a schedule where DeShawn would pick up Ta'riyah from daycare or preschool on Mondays, Wednesdays, and Fridays, and she would stay with him those nights. This continued until DeShawn

moved to Seattle in late 2011. After DeShawn moved, he brought Ta'riyah to Seattle many times to visit his family.

In 2012, DeShawn and Gilbert created a plan for her and Ta'riyah to move to Seattle. Gilbert believed moving to Seattle to be near DeShawn would be beneficial to Ta'riyah's well-being. Before moving, DeShawn and Gilbert contacted the Arizona Department of Health Services Office of Vital Records (the Department) to discuss DeShawn's desire to adopt Ta'riyah. Gilbert testified that the Department informed them that the best way to secure DeShawn's paternity over Ta'riyah would be for both him and Gilbert to appear and sign an acknowledgment of paternity.

On August 3, 2012, Gilbert and DeShawn signed an acknowledgment of paternity form in front of a witness at the Department. In accordance with the acknowledgment, the State of Arizona issued Ta'riyah an amended birth certificate naming DeShawn as her father. The birth certificate indicates it was issued on August 6, 2012.

Relying on the acknowledgment of paternity and the birth certificate from Arizona, the trial court denied Munchbar's motion for summary judgment and held that Ta'riyah qualified as a statutory beneficiary for DeShawn's wrongful death claim. Following a 9-day jury trial, the jury found in favor of the plaintiffs and awarded DeShawn's estate $3.7 million and Destiny $520,000. Munchbar appeals.

ANALYSIS

I. Standard of Review

We review summary judgment orders de novo, engaging in the same inquiry as the trial court. Michak v. Transnation Title Ins. Co., 148 Wn.2d 788, 794-95, 64 P.3d 22

(2003). Summary judgment is proper if, viewing the facts and reasonable inferences in the light most favorable to the nonmoving party, no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. CR 56(c); Michak, 148 Wn.2d at 794-95. The parties agree there is no genuine issue of material fact. The sole legal question is whether Ta'ryah qualifies as a statutory beneficiary to sustain DeShawn's wrongful death lawsuit.

We will reverse a trial court's evidentiary rulings only upon a showing of abuse of discretion. Subia v. Riveland, 104 Wn. App. 105, 113-14, 15 P.3d 658 (2001). "A trial court abuses its discretion if its decision is manifestly unreasonable or based on untenable grounds or untenable reasons." In re Marriage of Littlefield, 133 Wn.2d 39, 46-47, 940 P.2d 1362 (1997).

## II. Whether Ta'riyah qualifies as a statutory beneficiary under RCW 4.20.020

The main issue in this appeal is whether Ta'riyah qualifies as a statutory beneficiary to sustain DeShawn's wrongful death claim. We conclude Ta'riyah's birth certificate and acknowledgment of paternity establish DeShawn's paternity for purposes of the beneficiary statute.

The wrongful death statute authorizes the personal representative of a decedent to seek damages from the person who caused the death. But a wrongful death action may only be sustained on behalf of specific beneficiaries of the decedent. The beneficiary statute provides that every wrongful death action "shall be for the benefit of the wife, husband, state registered domestic partner, child or children, including stepchildren, of the person whose death shall have been so caused." RCW 4.20.020.

Washington courts have strictly construed the list of beneficiaries in RCW 4.20.020, "extend[ing] the literal scope of such statutes only to protect beneficiaries 'clearly contemplated by the statute.'" Masunaga v. Gapasin, 57 Wn. App. 624, 631, 790 P.2d 171 (1990) (quoting Roe v. Ludtke Trucking, Inc., 46 Wn. App. 816, 819, 732 P.2d 1021 (1987). Thus, the statute's designation of "child or children, including stepchildren" only contemplates "natural or adopted children of the decedent." Armijo v. Wesselius, 73 Wn.2d 716, 719, 440 P.2d 471 (1968). Even a "parent-child like" relationship is insufficient to satisfy the statutory beneficiary requirement for a wrongful death claim. See Tait v. Wahl, 97 Wn. App. 765, 770, 987 P.2d 127 (1999) (Even though the decedent raised her niece as her own child, the niece was not a "child" for purposes of RCW 4.20.020).

The respondents do not argue that DeShawn and Ta'riyah shared a "parent-child like" relationship sufficient for the beneficiary statute. Instead, they contend that Ta'riyah's birth certificate and acknowledgment of paternity establish that Ta'riyah is DeShawn's daughter as a matter of law.

Washington courts typically must enforce birth certificates and acknowledgments of paternity from other states. The full faith and credit clause, U.S. Const. art IV § 1, requires that "where a state court has jurisdiction of the parties and subject matter, its judgment controls in other states to the same extent as it does in the state where rendered." Riley et al. v. New York Trust Co., 315 U.S. 343, 349, 62 S. Ct. 608, 612, 86 L. Ed. 885 (1942). "If the foreign court had jurisdiction of the parties and of the subject matter, and the foreign judgment is therefore valid where it was rendered, a court of this state must give full faith and credit to the foreign judgment and regard the issues

-6-

thereby adjudged to be precluded in a Washington proceeding." In re Estate of Wagner, 50 Wn. App. 162, 166, 748 P.2d 639 (1987). Similarly, RCW 26.26.350 specifically directs courts to "give full faith and credit to an acknowledgement or denial of paternity effective in another state if the acknowledgment or denial has been signed and is otherwise in compliance with the law of the other state." RCW 26.26.350.

Ta'riyah's birth certificate and the acknowledgment of paternity carry the force of a court judgment and create a legal presumption that she is DeShawn's child. Under Arizona law, both a birth certificate and an acknowledgment of paternity each establish a presumption of paternity:

A. A man is presumed to be the father of the child if:

. . . .

3. A birth certificate is signed by the mother and father of a child born out of wedlock [or]

4. A notarized or witnessed statement is signed by both parents acknowledging paternity or separate substantially similar notarized or witnessed statements are signed by both parents acknowledging paternity.

B. If another man is presumed to be the child's father . . . an acknowledgment of paternity may be effected only with the written consent of the presumed father or after the presumption is rebutted. If the presumed father has died or cannot reasonably be located, paternity may be established without written consent.

ARIZ. REV. STAT. ANN. (ARS) § 25-814.[2] The same statute further provides that "[a]ny presumption under this section shall be rebutted by clear and convincing evidence." ARS § 25-814(C).

_____

[2] Notably, Washington recognizes a legal parent-child relationship under similar circumstances:

The statute governing acknowledgments of paternity provides that a "voluntary acknowledgment of paternity made pursuant to this section is a determination of paternity and has the same force and effect as a superior court judgment." ARS § 25-812(D). Indeed, Arizona courts presume an acknowledgment of paternity is valid unless it is successfully challenged:

> [A] purported voluntary acknowledgment of paternity is valid and binding until proven otherwise. The legislature has conferred on an affidavit of acknowledgment of paternity a presumption of validity, which may be rebutted only by clear and convincing evidence, and has strictly limited the avenues of collateral attack on such a determination to only those involving "fraud, duress, or a material mistake of fact."

Stephenson v. Nastro, 192 Ariz. 475, 967 P.2d 616, 624 (Ct. App. 1998) (quoting former ARIZ. REV. STAT. ANN. § 25-812(E) (1997)). Therefore, under Arizona law, the acknowledgment of paternity is presumptively valid and carries the same legal force as a superior court judgment. Further, a party can collaterally attack a foreign judgment only if it can establish the court lacked jurisdiction. In re Parentage of Infant Child F., 178 Wn. App. 1, 8, 313 P.3d 451 (2013). Munchbar has failed to make such a showing. See ARS §§ 25-801, 802 (establishing jurisdiction for acknowledgments of paternity).

---

> The parent-child relationship is established between a child and a man or woman by:
>
> . . . .
>     (2) An adjudication of the person's parentage;
>     (3) Adoption of the child by the person;
> . . . .
>     (6) The man's having signed an acknowledgment of paternity under RCW 26.26.300 through 26.26.375, unless the acknowledgment has been rescinded or successfully challenged.
>
> RCW 26.26.101.

Munchbar incorrectly argues the acknowledgment of paternity lacks the legal force of a judgment because neither of Ta'riyah's parents filed the acknowledgment in either superior court or the department of economic security as required by ARS § 25-812. But Arizona courts have rejected this argument, holding that an acknowledgement of paternity is still presumptively valid even if it has not been filed in superior court: "The fact that father did not additionally pursue the alternative procedure of filing these documents with the superior court did not deprive him of his paternity presumption otherwise acquired under [ARS § 25-814]." Stephenson, 967 P.2d at 624.

Munchbar also argues that the acknowledgment of paternity cannot establish paternity here because Arizona courts have held that the paternity statutes do not control the definition of the parent-child relationship in the context of a wrongful death proceeding. Munchbar relies on Aranda v. Cardenas, 215 Ariz. 210, 159 P.3d 76 (Ct. App. 2007) in which the court stated that "[t]he different purposes of the [paternity and wrongful death] statutes suggest no legislative intent that the paternity statutes apply to paternity determinations in wrongful death cases." Aranda, 159 P.3d at 214. But Munchbar misconstrues Aranda. The Aranda court did not hold that an acknowledgment of paternity or a birth certificate is insufficient to prove paternity for purposes of a wrongful death claim. Rather, the court held that it is not necessary to satisfy the paternity statutes to prove paternity.

In Aranda, a pregnant woman died along with her unborn child. Aranda, 159 P.3d at 212. The father filed a wrongful death claim as a statutory beneficiary of both the deceased mother and child. Aranda, 159 P.3d at 212. The defendants argued the father could not prove paternity under Arizona's paternity statutes. Because both the

mother and unborn child had died, the father could not produce an acknowledgment of paternity or DNA test results establishing paternity under the paternity statutes. Aranda, 150 P.3d at 212. The trial court granted the defendants' motion to dismiss, concluding the father could not prove paternity as defined by the paternity statutes. Aranda, 150 P.3d at 212. The court of appeals reversed, holding that the absence of a DNA test or presumption of paternity under the paternity statutes did not prevent the father from proving his paternity for purposes of a wrongful death claim:

> We decline to apply the requirements of the paternity statutes in a wrongful death proceeding where the legislature has not explicitly done so. Thus, we necessarily reject the defendants' argument that, in absence of a DNA test or other presumption of paternity, Aranda cannot prove his paternity.

Aranda, 159 P.3d at 215.

Therefore, although Munchbar correctly notes that Arizona's paternity statutes do not strictly apply to a paternity determination within the wrongful death context, the effect of the Aranda court's holding is that a plaintiff is not required to satisfy the paternity statute's definition in order to prove paternity. In other words, although the presence of a DNA test or other presumption of paternity under the paternity statutes may be sufficient evidence of paternity to pursue a wrongful death claim, the absence of such evidence will also not prevent pursuing the claim. See Aranda, 159 P.3d at 215 ("[The trial court] relied heavily on the absence of the types of proof acceptable in paternity actions in granting the defendants' motion and in so doing applied an incorrect standard in deciding the motion for summary judgment." (Emphasis added)). Indeed, the plaintiff here has more evidence of paternity than the plaintiff in Aranda. DeShawn's

estate produced an acknowledgment of paternity and a birth certificate, which the plaintiff in Aranda could not produce.

Munchbar also argues that we need not give full faith and credit to the acknowledgment of paternity because it does not comply with Arizona law. See RCW 26.26.350 ("A court of this state shall give full faith and credit to an acknowledgment or demand of paternity effective in another state if the acknowledgment or denial has been signed and is otherwise in compliance with the law of the other state." (Emphasis added)). But Munchbar lacks standing to challenge the acknowledgment of paternity. Both Washington and Arizona statutes narrowly define the class of persons with standing to challenge an acknowledgment of paternity. Neither state would permit a defendant like Munchbar standing in a paternity proceeding. See RCW 26.26.031; ARS § 25-803(A).

Though no Washington authority addresses whether a defendant like Munchbar may challenge an acknowledgment of paternity in a wrongful death proceeding, we note that some other jurisdictions do not allow a wrongful death defendant to collaterally attack a paternity determination. See, e.g., In re Dallas Group of America, Inc., 434 S.W.3d 647, 655 (Tex. Ct. App. 2014) ("None of these procedures [in the paternity statutes] grants third-party, non-family defendants in a wrongful death action standing to challenge Stoker's paternity of the children."). In Lucas v. Estate of Stavos, 609 N.E.2d 1114 (Ind. Ct. App. 1993), an Indiana court granted full faith and credit to a Louisiana determination of paternity and held it was not subject to collateral attack in a wrongful death proceeding even though the Louisiana determination was voidable under

Louisiana law. Lucas, 609 N.E.2d at 1118-19.[3] Courts similarly prohibit collateral

attacks of paternity determinations in intestacy proceedings. See In re Estate of

Murray, 344 P.3d 419 (Nev. 2015) (Parties who lacked standing to challenge paternity

under the Nevada Parentage Act could not collaterally attack paternity determination in

a probate proceeding); In re Trust Created by Agreement Dated Dec. 20, 1961, 166 N.J.

340, 765 A.2d 746, 756 (2001) ("[C]ourts in other jurisdictions appear to agree that third-

party challenges to paternity and legitimacy should be barred once those questions

have been resolved by acknowledgment or agreement of the putative parents or by

judicial decree.").

We note that Arizona courts have held that a wrongful death defendant may

dispute paternity even if that defendant would otherwise lack standing to do so. Hurt v.

Superior Court, 124 Ariz. 45, 601 P.2d 1329 (1979). Recognizing that a defendant in a

wrongful death proceeding would otherwise lack standing to challenge paternity, the

Hurt court held that the defendant could challenge paternity to question whether the

plaintiff is a proper party:

> The problem we face as to all three statutory methods of
> determining paternity is that the defendant in the wrongful death action
> would appear to have no standing to oppose the determination of the
> question. He would be an outsider. We believe that the defendant in a

---

[3] The Indiana Supreme Court's description of Lucas is similar to the facts here:
> [I]n Lucas the defendants in a wrongful death action attempted to
> deny that the decedent had a surviving minor child by challenging the prior
> determination by a Louisiana court that the decedent was the father of the
> child. The defendants were not a party to the Louisiana proceeding and
> were not served. The Court of Appeals affirmed the Indiana trial court's
> determination that the Louisiana proceeding was entitled to full faith and
> credit.

Stidham v. Whelchel, 698 N.E.2d 1152, 1155 (Ind. 1998).

> lawsuit may always question whether the plaintiff is a proper party if the issues is raised in a timely manner.
>
>     . . . .
>
> Assuming that the motion for summary judgment did, in fact, raise the issue of capacity to sue, we do not believe it was an abuse of discretion to require a determination of this matter prior to trial. We do not agree, however, that it must be a separate, independent action: it can be determined at a pretrial hearing on the issue of the plaintiff's capacity to sue properly raised by the pleadings.

Hurt, 601 P.2d at 1332-33.

Hurt is distinguishable, however. Unlike this case, the decedent in Hurt never established his paternity under any of the available procedures in Arizona's paternity statutes. Hurt, 601 P.2d at 1332. Here, DeShawn's estate produced a birth certificate and acknowledgment of paternity. These documents carry the force of a superior court judgment and establish a legal presumption that DeShawn is Ta'riyah's father. Washington courts must grant them full faith and credit. Wagner, 50 Wn. App. at 166. We therefore conclude that Ta'riyah's birth certificate and the acknowledgment of paternity were sufficient to establish that she is DeShawn's "child" for purposes of the wrongful death beneficiary statute.

### III. Exclusion of "Lifestyle" Evidence

Munchbar argues the trial court abused its discretion when it excluded lifestyle evidence regarding DeShawn. Munchbar sought to introduce evidence that DeShawn had sold marijuana in the past, that he stored "drug money" at his mother's house, that he had a criminal history and was incarcerated in Arizona from June to December 2011, and that he had never been employed in his adult life. CP at 676. The trial court excluded the evidence as more prejudicial than probative, but it stated that Munchbar

No. 73447-4-I/14

could introduce the evidence if the plaintiffs alleged economic losses or suggested that DeShawn was a "good role model" for Ta'riyah:

> Each of the motions [to exclude character evidence] is presumptively granted. That is to say, the trial will begin with the expectation that if there is no attempt to suggest either economic losses ("good provider") or general good character ("role model") of the deceased, then the potential prejudice of these matters outweighs their probative value. The focus should stay on the "love, care, and companionship" he provided, and would have provided, to his child; how he related to others, friends or enemies, should be avoided. Depending on how plaintiffs' case is presented at trial, these issues may certainly need to be revisited out of the jury's presence.

CP at 677. Munchbar fails to cite anywhere in the record where the plaintiffs attempted to suggest either economic loss or general good character, thereby opening the door to DeShawn's character evidence. Instead, Munchbar contends the evidence was admissible under ER 404(b) and not inadmissible under ER 403.

We will reverse a trial court's evidentiary rulings only upon a showing of abuse of discretion. Subia, 104 Wn. App. at 113-14. "A trial court abuses its discretion if its decision is manifestly unreasonable or based on untenable grounds or untenable reasons." Littlefield, 133 Wn.2d at 46-47. Even if a trial court's evidentiary rulings were erroneous, the appellant must also show that the error was prejudicial. "Error will not be considered prejudicial unless it affects, or presumptively affects, the outcome of the trial." Brown, 100 Wn.2d at 189.

The trial court did not abuse its discretion here. Prior instances of conduct are rarely admitted in civil cases to show character. See 5A KARL B. TEGLAND, WASHINGTON

-14-

PRACTICE: EVIDENCE LAW AND PRACTICE § 405.5 (5th ed. 2007).[4] Specific instances of conduct may be used to prove character only when character is an issue in the case or to rebut evidence of character. ER 405(b). Munchbar correctly notes that specific acts may be admitted as character evidence in child custody disputes. See, e.g., In re Interest of Infant Child Skinner, 97 Wn. App. 108, 982 P.2d 670 (1999). But this is a rare exception to the rule. In a wrongful death case, the type of character evidence Munchbar sought to introduce—prior convictions and unemployment—is typically only relevant to prove economic damages based on future earning capacity. See Maicke v. RDH, Inc., 37 Wn. App. 750, 752, 683 P.2d 227 (1984) (decedent's prior convictions were relevant to future earning capacity in wrongful death action).

The plaintiffs here abandoned their claim for economic damages before trial. Absent economic damages, the primary focus of the wrongful death claim is for the beneficiary to demonstrate the relationship with the decedent:

> The beneficiaries in such actions are entitled to compensation for their own losses from the untimely death of a family member. Logically, the proper way to demonstrate those losses is, as the trial court recognized, to allow plaintiffs to present evidence showing what the relationship would have been like but for the wrongful conduct of the defendant.

---

[4] "[E]vidence of a person's character is relevant and admissible in a civil case when the person's character is directly at issue under the pleadings and applicable law. Such cases, however, are relatively unusual . . . .

"More often, a person's character is not directly at issue in a civil case, and the question is whether evidence of character is admissible as evidence that the person was likely to have acted in conformity with that character on a particular occasion. The general rule under Rule 404(a) is that it is not admissible for this purpose." 5 KARL B. TEGLAND, WASHINGTON PRACTICE: EVIDENCE LAW AND PRACTICE § 404.3 (5th ed. 2007) (emphasis added).

Bowers v. Fibreboard Corp., 66 Wn. App. 454, 460, 832 P.2d 523 (1992). This includes "evidence of the decedent's . . . contributions of time, energy, and emotional support to the relationship" with the surviving beneficiary. Bowers, 66 Wn. App. at 460.

The trial court reasonably concluded that the character evidence Munchbar offered was not relevant to this inquiry. DeShawn's character was not directly at issue in the case—his relationship with Ta'riyah was. His prior criminal history is not probative of what DeShawn contributed to his relationship with Ta'riyah or what their "relationship would have been like but for [Munchbar's] wrongful conduct." Bowers, 66 Wn. App. at 460. Of course, as the trial court properly noted, Munchbar could introduce specific acts to rebut character evidence introduced by the plaintiffs. But Munchbar has failed to show that the plaintiffs improperly opened the door to this evidence.

Further, although Munchbar claims the character evidence was relevant to show DeShawn's character regarding his relationship to Ta'riyah, Munchbar's primary argument at trial was that DeShawn and Destiny were engaged in a feud with Ja'Mari Jones. It argued that DeShawn was at fault for the incident because he and Destiny planned to take revenge on Jones by attacking him at the club. Allowing the evidence could have therefore confused the jury and allowed them to use it for an improper purpose. See ER 404(b) ("Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." (Emphasis added)). Under these circumstances, the trial court did not abuse its discretion when it conclude the proffered evidence of prior acts was inadmissible under ER 404(b) or ER 405.

But even if the character evidence was plausibly admissible under ER 404(b) or ER 405, the trial court nevertheless acted within its discretion when it excluded the evidence as more prejudicial than probative under ER 403. Trial courts have considerable discretion when balancing the probative value of evidence against its potential prejudicial impact. Given the speculative relevance of DeShawn's prior acts and the nature of Munchbar's trial theory, discussed above, the trial court could have reasonably excluded the evidence as prejudicial under ER 403.

Finally, even if the trial court erred, Munchbar has failed to show that the error was prejudicial. "Error will not be considered prejudicial unless it affects, or presumptively affects, the outcome of the trial." Brown, 100 Wn.2d at 196. The exclusion of the evidence did not affect the outcome of the trial here. Despite the trial court's exclusion of the character evidence, Munchbar nevertheless was able to make many of the same arguments. For example, Munchbar elicited testimony that DeShawn did not have a job. Munchbar also emphasized the low frequency of DeShawn's visits with Ta'riyah.

Munchbar strongly insinuated that Destiny and DeShawn operated with criminal intent. During closing, Munchbar emphasized that both Destiny and DeShawn "hung around people with guns." Report of Proceedings (RP) (Mar. 30, 2015) at 1443. Counsel argued that the reason DeShawn died was because he and Destiny chose "to instantaneously attack a convicted murderer." RP (Mar. 30, 2015) at 1445. Munchbar explained that DeShawn and Destiny were in a feud with Ja'Mari Jones over money that he stole. As part of this feud, DeShawn and Destiny specifically planned to attack Jones. Munchbar argued "Destiny and DeShawn's plan did not know the bounds of a

place. It was only, when you see him [Jones], you let me know and I will take care of the rest." RP (Mar. 30, 2015) at 1456. According to Munchbar, DeShawn "wanted that revenge" against Jones. RP (Mar. 30, 2015) at 1460.

A major theme of Munchbar's defense was that DeShawn was a reckless vigilante: "How many of us have friends or acquaintances where somebody has ripped off somebody for $100,000, doesn't tell the police about it, and decides we are going to take it into our own hands?" RP (Mar. 30, 2015) at 1467. Munchbar described the night club incident as "street justice, plain and simple." RP (Mar. 30, 2015) at 1492. Munchbar again emphasized the few times DeShawn visited with Ta'riyah during closing, and suggested that DeShawn provided little guidance to his daughter:

> Guidance? What do we know about DeShawn Milliken? There is so little that we know. We don't know what he did for a living. He has a safe under his bed. A hundred thousand dollars in it.
>
> The timing of the Ja'Mari . . . vendetta. It could have happened anywhere at any time. And Ta'riyah, if she was here on vacation, would she have been witness to this? Is this the kind of guidance that they are asking for?

RP (Mar. 30, 2015) at 1479. Munchbar's argument may have had some effect on the jury. The plaintiffs asked for a total of $9 million on behalf of Ta'riyah. The jury awarded $3.7 million. Under these circumstances, Munchbar has failed to show that the exclusion of DeShawn's prior acts affected the outcome of the trial.

IV. <u>Jury Instructions</u>

Finally, Munchbar claims the trial court erred when it declined to give several of Munchbar's proposed jury instructions. But the trial court did not abuse its discretion, and Munchbar has failed to show that any jury instruction caused prejudice.

-18-

The number and specific language of jury instructions is a matter within the court's discretion. Havens v. C&D Plastics, Inc., 124 Wn.2d 158, 165, 876 P.2d 435 (1994). Instructions are sufficient when they permit a party to argue its theory of the case, are not misleading, and when read as a whole properly inform the trier of fact on the applicable law. Douglas v. Freeman, 117 Wn.2d 242, 256, 814 P.2d 1160 (1991). An erroneous jury instruction requires reversal only if it causes prejudice. Ezell v. Hutson, 105 Wn. App. 485, 488, 20 P.3d 975 (2001).

### 1. Definition of "Fault"

Munchbar claims jury instruction 12 failed to include "recklessness" as a possibility in the definition of fault. That instruction provided that "[t]he term 'fault' includes negligence, as defined in these instructions, as well as willful misconduct." Clerk's Papers (CP) at 3216. In contrast, RCW 4.22.015 defines "fault" as "acts or omissions . . . that are in any measure negligent or reckless toward the person or property of the actor or others . . . ." RCW 4.22.015. Munchbar argues that it presented sufficient evidence that DeShawn behaved recklessly and therefore that it should have been granted a "fault" instruction allowing for the jury to find his conduct was reckless.

The trial court did not abuse its discretion by providing jury instruction 12. The instruction does not misstate the applicable law, and Munchbar has failed to show how the instruction prevented it from arguing its theory of the case. Munchbar asserted comparative fault, and the instruction allowed for the jury to attribute fault to DeShawn or Destiny. Nothing prevented Munchbar from asserting that their conduct arose to recklessness.

Indeed, including "recklessness" as an option would not have changed the outcome of the case. Attributing fault to DeShawn and Destiny depended only on whether the jury found that they acted with "negligent conduct or willful misconduct." CP at 3219. Specifically, the verdict form required the jury to answer this question: "Was negligent conduct or willful misconduct of any of the following also a proximate cause of injury and damage to the plaintiffs? . . . (Indicate with a 'yes' or 'no' on the line provided.)" CP at 3219. The jury indicated a "yes" next to both Destiny and DeShawn.

Importantly, though, the form did not ask the jury to differentiate between "negligent" and "willful" misconduct. Therefore, comparative fault only required the jury to find that Destiny and DeShawn acted with at least "negligent" conduct. Because recklessness requires a high showing of intent than negligence, adding recklessness as an option in the jury instructions would not have changed the outcome of the case. A finding of recklessness would have resulted in the same "yes" under the fault question on the verdict form. Therefore, even if the trial court erred, the instructions did not cause prejudice.

2. Louis Holmes Instruction

Munchbar claims the trial court erred by declining to include an instruction permitting the jury to identify Louis Holmes as a potential at-fault entity. But the trial court concluded that no evidence supported an inference that Holmes caused the altercation. Munchbar has failed to cite anything in the record rebutting this finding. The record shows that Holmes joined the altercation after DeShawn and Jones had already begun fighting. A trial court acts within its discretion when it declines an instruction unsupported by sufficient evidence. See Diaz v. State, 175 Wn.2d 457, 285

P.3d 873 (2012) ("Without a claim that more than one party is at fault, and sufficient evidence to support that claim, the trial judge cannot submit the issue of allocation to the jury."). The trial court here likewise did not abuse its discretion.

### 3. Jury Instructions 7 and 9

Munchbar argues that jury instructions 7 and 9 constitute and improper comment on the evidence. Jury instruction 7 provides that the plaintiffs have the burden of proving that the defendant was negligent. Jury instruction 9 provides that an "operator of a nightclub owes a duty to its patrons to exercise ordinary care to protect them from reasonably foreseeable criminal conduct of third parties. Breach of this duty is negligence." CP at 3212. The instruction also clarifies that the violation of Washington law "is not necessarily negligence, but may be considered by you as evidence in determining negligence." CP at 3212.

Munchbar has failed to show that these instructions are erroneous. Munchbar's entire argument relating to jury instructions 7 and 9 amounts to 4 sentences containing no citation to authority, nor do they provide any analysis on why the instructions are erroneous. Munchbar simply asserts, without further detail, that the instructions constitute a comment on the evidence and facilitated a disproportionate jury response. It is difficult to discern Munchbar's argument given its passing treatment of this issue. See Palmer v. Jensen, 81 Wn. App. 148, 153, 913 P.2d 413 (1996) ("Passing treatment of an issue or lack of reasoned argument is insufficient to merit judicial consideration.").

Nevertheless, the trial court did not abuse its discretion when it gave the instructions. The instructions accurately state the applicable law and did not prevent Munchbar from arguing its theory of the case. Further, Munchbar admitted its own

negligence at the beginning of the case. Therefore, Munchbar cannot show that these instructions caused prejudice.

### 4. "Guidance" Instruction

Finally, Munchbar argues the trial court erred when it included the word "guidance" in its instruction for damages. The instruction asked the jury to consider "[t]he value of what DeShawn Milliken reasonably would have been expected to contribute to his daughter Ta'riyah Smith-Milliken in the way of love, care, companionship and guidance." CP at 3214.

The trial court did not abuse its discretion in providing this instruction. The instruction is an accurate statement of the law and Munchbar has failed to show how it prevented it from arguing its theory of the case. See WPI 31.03.01 (requiring jury to consider "love, care, companionship, and guidance"); Ueland v. Reynolds Metals Co., 103 Wn.2d 131, 140, 691 P.2d 190 (1984) ("child has an independent cause of action for loss of the love, care, companionship, and guidance of a parent tortuously injured by a third party."). Further, Munchbar was aware the plaintiffs would be seeking damages based on guidance well before the court considered jury instructions. Munchbar has therefore failed to show that addition of the word "guidance" from jury instruction 11 prejudiced the outcome.

### V. Other Errors

We note that Munchbar's opening brief contains several assignments of error that are not addressed—or even subsequently mentioned—in the remainder of its brief. We need not address these issues. See Emerick v. Cardia Study Ctr. Inc., P.S., 189

Wn. App. 711, 730 n.8, 357 P.3d 696 (2015) ("A party waives an assignment of error not adequately argued in its brief.").

CONCLUSION

For the foregoing reasons, we affirm.

Trickey, ACJ

WE CONCUR:

Appelwick, J

Cox, J.